**OVRS ACQUISITION CORP., Appellant–
Defendant Third Party Plaintiff,**

v.

**COMMUNITY HEALTH SERVICES,
INC., Appellee–Plaintiff.**

**OVRS ACQUISITION CORP., Appellant–
Defendant Third Party Plaintiff,**

v.

**James A. SCHELLER.**

No. 82A05–9410–CV–425.

Court of Appeals of Indiana.

Oct. 26, 1995.

Rehearing Denied Jan. 4, 1996.

120

Paul J. Wallace, Greg A. Granger, David E. Gray, Bowers Harrison Kent & Miller, Evansville, for Appellant.

James D. Johnson, Mattingly Rudolph Fine & Porter, Evansville, for Community Health Services, Inc.

Wayne S. Trockman, Newman Trockman Lloyd Flynn & Rheinlander, Evansville, for James A. Scheller.

## OPINION

SHARPNACK, Chief Judge.

Ohio Valley Respiratory Medical Services Acquisition Corp. ("OVRS") appeals the judgment in favor of Community Health Services, Inc. ("CHS") for damages resulting from a breach of a covenant not to compete ("covenant"). OVRS also appeals the negative judgment on its claim against third-party defendant, James Scheller. CHS cross-appeals on the amount of damages. We affirm.

OVRS raises six issues for review which we restate as whether the trial court erred by:

(1) not specifying whether it applied the law of Kentucky or Indiana in rendering the judgment;

(2) finding the covenant to be supported by consideration;

(3) enforcing the covenant;

(4) finding that the contract provided for mutuality of obligations;

(5) finding that CHS did not terminate the Management Agreement; and

(6) finding that neither CHS nor Scheller breached a fiduciary duty owed to OVRS.

On cross-appeal, CHS appeals the amount of damages awarded to it by the trial court.

The facts most favorable to the judgment follow. In 1993, CHS filed suit against OVRS for damages totalling $130,000.00. The complaint alleged that OVRS breached a contract between OVRS and CHS which prohibited OVRS from competing against CHS in servicing two Kentucky nursing facilities. OVRS raised affirmative defenses which included failure and want of consideration, failure to name the real party in interest, estoppel, fraud, misrepresentation, and bad faith. Later, OVRS filed a third-party complaint against Scheller, its former employee, for executing a contract (entitled the "management agreement") without authority. The management agreement included a covenant not to compete. OVRS filed a motion for summary judgment, which was denied by the court. On February 16 and 17, 1994, the case was tried to the court. On July 22, 1994, the trial court entered judgment in favor of CHS and issued findings of fact and conclusions thereon. The relevant findings include:

### "FINDINGS OF FACT

1. Plaintiff, Community Health Services, Inc. (hereinafter "CHS"), is a corporation organized under the laws of the State of Kentucky, with its principal place of business in Owensboro, Kentucky. CHS' business primarily consists of providing health care therapies.

2. Mike Reiherzer ("Reiherzer") is the sole shareholder, President and Chief Executive Officer of CHS.

3. Defendant/third party plaintiff, OVRS Acquisition Corp. ("OVRS") is a corporation organized under the laws of the State of Indiana, with its principal places of business being Evansville, Indiana, and Henderson, Kentucky.

4. Robert Jobes ("Jobes") and Michael Weber ("Weber") are the principal shareholders of OVRS, Jobes is the President, and Weber is the Treasurer of OVRS.

5. The third-party defendant, James A. Scheller ("Scheller"), during all times relevant to this case, was the Vice President, shareholder, and Chief Operating Officer of OVRS in charge of the day-to-day operations of OVRS and with marketing and attempting to increase the business of OVRS.

6. Unicare Homes, Inc. ("Unicare") is a corporation with its principal place of business in Milwaukee, Wisconsin. Unicare owns and operates numerous nursing and extended care homes, one (1) of which being the Medco Center of Henderson ("Henderson Medco"), and another being the Medco Center of Owensboro ("Owensboro Medco") (referred to collectively as "the Medcos").

7. CHS and Unicare entered into two (2) Therapy Service Agreements. One (1) was for CHS to provide respiratory therapy services ("R/T") for the Owensboro Medco, and the other was for CHS to provide R/T for the Henderson Medco (collectively referred to as "Medco Contracts"). The Medco Contracts became effective January 1, 1992.

8. On the same date, OVRS and CHS entered into an agreement entitled the "Management Agreement" whereby OVRS and CHS would jointly service the Medco Contracts. The Management Agreement contains a list of the services to be provided by OVRS, the method of compensation to OVRS, and a non-compete provision between CHS and OVRS.

9. The non-compete provision provides: Non-compete: OHIO VALLEY RESPIRATORY AND MEDICAL SERVICES (OVRS) agrees not to contract services with the Medco Centers of Henderson and Owensboro directly for a minimum period of one (1) year following the termination of the existing agreement unless expressly approved by COMMUNITY HEALTH SERVICES (CHS).

10. The Management Agreement is executed by Reiherzer for CHS and Scheller as Vice President for OVRS. Although the Management Agreement was not signed on December 31, 1991, it was dated on that date so it would be in effect contemporaneously with the Medco Contracts.

11. Prior to the execution of the Medco Contracts, Scheller, and Vice President for OVRS, sent a letter to Steve Marshall ("Marshall"), then Vice–President of Ancillary Services for Unicare, describing OVRS and CHS, and outlining what both companies' involvement would be in the providing of R/T for the Medcos.

12. CHS had a Certificate of Need ("CON") with the State of Kentucky. Marshall required that whomever was awarded the Medco Contracts have a CON. Although on the date of execution of the Medco Contracts Marshall believed a CON was no longer necessary, Marshall contracted with CHS because the decision to award the Medco Contracts to CHS was made prior to Marshall's believed knowledge of the lack of a necessity for a CON.

13. Prior to the execution of the Medco contracts, Reiherzer had communicated to Scheller and Jobes that he sought protection against OVRS taking the Medco Contracts from CHS.

14. Reiherzer's desire for protection against OVRS arose from a joint venture/partnership that Reiherzer was involved in with Jobes, Weber and Scheller. The joint venture was called Infusion Kare and Reiherzer owned fifty percent (50%) interest in Infusion Kare. Infusion Kare was negotiating with St. Mary's Hospital in Evansville, Indiana, to provide outpatient treatments for patients of St. Mary's. As Infusion Kare and St. Mary's were negotiating, it became apparent to the parties that it could be a lucrative agreement. Jobes, Weber and Scheller decided that Reiherzer should not receive fifty percent (50%) of the profits from the potential St. Mary's contract and discussed this with Reiherzer. Reiherzer rejected an offer that he would receive less than fifty percent (50%) of the profits. In response to Reiherzer's failure to lessen his percentage of ownership in Infusion Kare, Jobes, Weber and Scheller, under the name of OVRS, had their attorney, Paul Wallace, send a letter to Reiherzer stating that Infusion Kare joint venture (partnership) would be terminated effective September 30, 1991, due to the fact that Reiherzer would not lower his interest in the joint venture. Scheller, Weber and Jones nominated Scheller to wind up the joint venture. Scheller delivered the letter to Reiherzer.

15. The Management Agreement was drafted by Scheller as Vice President for OVRS. Scheller presented a draft of the Management Agreement to both Reiherzer and Jobes. The draft did not contain a non-compete provision, and Reiherzer stated to Scheller that OVRS would not receive any money from the Medco Contracts unless there was in place an agreement including a non-compete provision between CHS and OVRS as to the Medco Contracts. Jobes stated to Scheller that the compensation provisions of the draft should be changed to define net revenues.

16. Scheller communicated to Jobes that Reiherzer insisted on the non-compete provision. OVRS had lost money since Jobes and Weber had become the principal shareholders, and OVRS was in financial need of a portion of the revenues from the Medco Contracts. OVRS would not have received any money from the Medco Con-

tracts unless it executed a contract with CHS containing a non-compete provision. Jobes understood why CHS required a non-compete provision and agreed that Scheller could execute the Management Agreement containing the non-compete provision. Scheller, acting as Vice President for OVRS with express authority from Jobes, prepared and executed on behalf of OVRS the Management Agreement.

\* \* \* \* \* \*

18. CHS and OVRS performed pursuant to the Management Agreement from January 1, 1992, until March 4, 1993. OVRS' contractual requirements were performed by Jim Scheller.

19. On March 4, 1993, Scheller was terminated as Vice President of OVRS. OVRS did not provide anyone else to assist CHS in performing OVRS' requirements pursuant to the Management Agreement in servicing the Medco Contracts, nor did OVRS further assist CHS in servicing the Medco Contracts.

20. In March of 1993, Jobes, Weber and Keith Thomas traveled to Milwaukee to meet with the principals of Unicare in an attempt to have the Unicare contracts between CHS and Unicare terminated and have Unicare execute new contracts with OVRS to provide R/T for the Medco.

21. Jobes' and Weber's actions were successful, and on March 30, 1993, CHS received a letter from Bruce Paller, the Vice President of Ancillary Operations for Unicare, stating CHS had provided "quality" R/T, but terminating the Medco Contracts effective May 1, 1993.

22. On the same date, May 1, 1993, Unicare and OVRS entered into two (2) contracts, one (1) for the Owensboro Medco, and the other for the Henderson Medco, whereby OVRS would begin providing R/T to the Medcos. OVRS had continued to provide R/T for the Medcos. OVRS' action in contracting with Unicare to provide R/T and continuing to provide R/T for the Medcos within one (1) year after the termination of the Medco Contracts between CHS and Unicare was and is a direct breach of the non-compete provision of the Management Agreement.

23. CHS performed all its obligations pursuant to the Management Agreement. CHS did not either expressly or in any way approve OVRS [sic] breach of the non-compete provision.

24. In March of 1993, after CHS had performed pursuant to the Medco Contracts for three (3) months, Jobes, Weber, Scheller and Reiherzer formed a new corporation called Diversified Health Services, Inc. ("DHS"). DHS was formed to service another health care contract. Jobes, Weber, Reiherzer and Scheller agreed that CHS would use DHS as a conduit for the money received from Unicare. Pursuant to the parties' oral agreement, CHS would bill Unicare for the services provided to the Medcos, Unicare would them pay CHS, CHS would send a check for the entire amount paid by Unicare to DHS, DHS would pay the expenses, and then divide the profits from the net revenues as defined by the Management Agreement between OVRS and Reiherzer, the sole owner of CHS.

25. The profits from the Medco Contracts for 1992 were One Hundred Sixty Thousand Nine Hundred Twenty–Five Dollars ($160,925.00). The revenues from the Medco Contracts for the months of January through August 1993 increased an average of Three Thousand Seven Hundred Sixty–Two Dollars ($3,762.00) per month. This amount annualized over twelve (12) months is Forty–Five Thousand One Hundred Forty–Four Dollars ($45,144.00)."

Record, pp. 419–425.

*Discussion*

At the outset, we address our standard of review of findings of facts and conclusions thereon. Trial Rule 52 defines the standard and provides, "[o]n appeal of claims tried by the court without a jury ..., the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Ind.Trial Rule 52. In applying this rule, we employ a two-tiered

standard of review. *W & W Equipment Co. v. Mink* (1991), Ind.App., 568 N.E.2d 564, 569, *reh'g denied, trans. denied.*

First, we consider whether the evidence supports the findings. In determining whether findings are clearly erroneous, we construe the findings liberally in support of the judgment. *Citizens Progress Co., v. James O. Held & Co.* (1982), Ind.App., 438 N.E.2d 1016, 1022. The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Cooper v. Calandro* (1991), Ind.App., 581 N.E.2d 443, 444–445, *reh'g denied, trans. denied.*

Next, we determine whether the findings support the judgment. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *DeHaan v. DeHaan* (1991), Ind.App., 572 N.E.2d 1315, 1320, *reh'g denied, trans. denied.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan v. Ivy Knoll Apts. Partnership* (1989), Ind.App., 537 N.E.2d 47, 50. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* Finally, we must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

Before addressing the merits of this case, we also must determine which state's substantive law applies under Indiana's choice of law rules. Indiana's choice of law rule for contractual disputes requires us to apply the law of the forum with the most intimate contacts to the facts. *Dohm & Nelke v. Wilson Foods Corp.* (1988), Ind.App., 531 N.E.2d 512, 513. In making this determination, we consider a number of factors, including the place of contracting and negotiation, the place of performance, the location of the subject matter, and the parties' places of business. *Eby v. York–Division, Borg–Warner* (1983), Ind.App., 455 N.E.2d 623, 626. The record reveals the following: OVRS is a Kentucky corporation; CHS has its principal place of business in Kentucky; and the contract was signed in Kentucky and requires service of two Kentucky nursing facilities. Viewing these factors as a whole, we find that Kentucky has the most intimate contacts to this litigation. Therefore, we will apply the substantive law of Kentucky. *See Dohm,* 531 N.E.2d at 514.

I.

The first issue raised for our review is whether the trial court erred when it failed to designate which state's law it applied in deciding this case. OVRS contends the case should be remanded to the trial court for a statement of which law was applied since "it is impossible to determine from the judgment or any other ruling entered below whether the Trial Court applied Indiana or Kentucky law to this case." Appellant's brief, p. 24. CHS asserts that OVRS failed to cite any authority for its proposition that the trial court is required to specify the substantive law applied. In its reply brief, OVRS contends it cited to T.R. 44.1 as authority. OVRS argues that the trial rule requires the trial court to designate the substantive law applied. Viewing the plain language of the rule, we disagree. T.R. 44.1 provides:

"Judicial notice, proof and notice of intent to offer evidence of the law of another jurisdiction not covered by subdivision (A) of this rule [law of a foreign country] shall be governed by the Uniform Judicial Notice of Foreign Law Act [I.C. 34–3–2–1, *et seq.*]...."

T.R. 44.1(B). The Act provides as follows:

Sec. 1. "Every court of this state shall take judicial notice of the common law and statutes of every state,...."

Sec. 2. "The court may inform itself of such laws in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information."

Sec. 3. "The determination of such laws shall be made by the court and not by the jury, and shall be reviewable...."

Sec. 4. "Any party may also present to the trial court any admissible evidence of such laws,...."

I.C. § 34–3–2–1—4. Neither the rule nor the statute expressly provides that the trial

court must designate the substantive law applied. Moreover, there is no case law to support this contention.

■ Next, OVRS warns us against making the "dangerous assumption" that the trial court applied the correct law. OVRS claims we must remand for a proper ruling on the law used to ensure a legitimate review. However, OVRS failed to demonstrate how it was prejudiced by the court's failure to indicate which law it used. OVRS provided no evidence that the trial court failed to use Kentucky law in its decision, especially since both parties used Kentucky law throughout their briefs. We have applied the law of Kentucky to the merits of this case and find that the trial court did not reach a result contrary to that required under Kentucky law. Therefore, assuming *arguendo*, the trial court erred by failing to designate which law was applied, we find the error to be harmless.[1]

## II.

■ The second issue is whether the court below erred in finding that the covenant was supported by consideration. OVRS argues that in February 1991, OVRS and CHS reached an oral agreement in which they pursued a respiratory therapy contract with two Unicare facilities in Kentucky. According to the agreement, the parties were to share the profits and losses equally if the contract was obtained. A year later, the parties reduced their agreement to writing in the management agreement and added a single new term, the covenant not to compete. OVRS argues the additional term was unsupported by consideration. Consideration is required to modify an existing contract. *Whayne Supply Co. v. Gregory* (1956), Ky., 291 S.W.2d 835, 838.

■ CHS argues that OVRS' underlying assumption is erroneous because in order to have a modification of a contract, a contract must first exist. CHS contends the "oral agreement", as referred to by OVRS, was not a contract. Consequently, the management agreement was the only contract between the parties. Therefore, we need only look to the terms of the management agreement in order to assess the enforceability of the contract. While we express no opinion as to the validity of CHS' argument, we confirm the trial court's implicit finding that no oral contract existed. OVRS bore the burden to prove the existence of the oral contract as a part of its defense that the noncompetition provision in the written contract was unenforceable for lack of consideration. *See Ochoa v. Ford* (1994), Ind.App., 641 N.E.2d 1042, 1044. "The party urging the validity of a contract bears the onus of proving its existence." *Id.* The failure of the trial court to find that there was an oral contract is a negative judgment as to that aspect of OVRS' defense.

■ Applying Indiana's standard of review, a party appealing a negative judgment must establish that the evidence is without conflict and leads to but one conclusion and that the trial court did not reach that conclusion. *Rogers v. Rogers* (1982), Ind.App., 437 N.E.2d 92, 95. The appellant can attack the trial court's judgment only as contrary to law. *Spurlock v. Fayette Federal Savings & Loan Ass'n* (1982), Ind.App., 436 N.E.2d 811, 815. In determining whether the judgment is contrary to law, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* Instead, we will consider only the evidence most favorable to the judgment together with all reasonable inferences which may be drawn therefrom. *Maddox v. Wright* (1986), Ind. App., 489 N.E.2d 133, 134 *reh'g denied.* Finally, we may reverse only if the evidence leads to one conclusion, which is opposite that reached by the trial court. *Spurlock,* 436 N.E.2d at 815.

■ The findings of facts and conclusions thereon neither expressly refer to an oral contract nor imply that one was considered in the analysis. The reasonable inference to be drawn is that the trial court determined no oral contract existed. There was some evidence that there was an oral contract and

---

1. We urge trial judges to specify what law they apply in conflicts of law settings so that efficient review is possible.

some evidence that there was not. We will not reweigh the evidence. The trial court's judgment is not contrary to law.

Turning to the written agreement itself, the trial court did not err in finding that consideration existed for the covenant in the management agreement. Consideration is defined as a "benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Phillips v. Phillips* (1943), Ky., 171 S.W.2d 458, 464. A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled. *Id.* A detriment is a legal right the promisee has forborne. *Id.*

Applying the law to the findings of fact, the trial court found the management agreement, including the covenant, to be a valid, binding, and enforceable contract. CHS promised to split the profits obtained under the Medco contracts with OVRS and OVRS promised to perform according to the terms of the management agreement, including the covenant. Therefore, OVRS obtained a benefit from CHS, and CHS forbore a legal right to keep all of the profits obtained under the Medco contracts. Accordingly, the trial court did not err in finding the covenant to be supported by consideration.

### III.

The third issue raised is whether the trial court erred in enforcing the covenant not to compete. We conclude it did not.

In a lengthy argument, OVRS argues that contracts which restrain trade are not favored by Kentucky law and must be reasonable to be valid. OVRS asserts this covenant is unreasonable. Furthermore, OVRS contends, "[t]he covenant does not serve to protect any legitimate interest of CHS and only seeks to punish OVRS for at least one year by precluding it from doing business with a company with whom CHS no longer conducts business." Appellant's brief, p. 29 (original emphasis).

In its response, CHS contends that Kentucky's public policy distinguishes among covenants between employers and employees, those concerning the sale of a business, and those between professionals. CHS cites cases which upheld various covenants, all of which concern the sale of businesses.

In its reply brief, OVRS contests the implication that this action involves the sale of a business. The resolution of this debate, however, is not dispositive to our review. The facts of this case are unique and we find no Kentucky case directly on point.

However, while Kentucky law tends to disfavor noncompetition clauses between employers and employees, it appears to tolerate reasonable restraints on competition with respect to business ventures. *Calhoun v. Everman* (1951), Ky., 242 S.W.2d 100, *reh'g denied* (oral agreement between employer and former employee not to engage in competing cleaning and laundry business held not enforceable because agreement not specific as to time and territory and created an undue hardship on defendant); *cf. Martin v. Ratliff Furniture Co.* (1954), Ky., 264 S.W.2d 273 (holding a noncompetition agreement between a furniture company and its former stockholder's furniture company reasonable as to both time and space). The difficulty for us lies in our inability to categorize the present action as an employer-employee action or as one involving the sale of a business.

However, our review of Kentucky law brings us to the conclusion that the Kentucky courts apply a test of reasonableness in assessing restraints on competition, even in the context of employer-employee contracts:

"[I]t has been held in Kentucky that an agreement in restraint of trade is reasonable if, on consideration of the subject, nature of the business, situation of the parties and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted."

*Hammons v. Big Sandy Claims Service, Inc.* (1978), Ky.App., 567 S.W.2d 313, 315 (citing *Ceresia v. Mitchell* (1951), Ky., 242 S.W.2d 359 (holding that a test of reasonableness is applied in assessing a covenant where the seller of a business agrees to never engage in a competitive business)).

OVRS relies on a the case of *Crowell,* where the Kentucky court reviewed the reasonableness standard:

"Ancillary covenants of this character are valid and enforceable if the terms are reasonable in light of the surrounding circumstances.... Reasonableness is to be determined generally by the nature of the business profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent."

*Crowell v. Woodruff* (1951), Ky., 245 S.W.2d 447, 449, *reh'g denied.*

■■■ Reasonableness, then, is the key policy consideration in assessing covenants under Kentucky law. Whether this particular covenant is reasonable is a factual determination to be made by the trial court. In applying our standard of review to a case where the outcome is not mandated by an established rule of law, but rests within the discretion of the trial court, we will reverse only if the decision is not consistent with the findings and conclusions or if the reasons given are insufficient as a matter of law to justify the manner in which the court exercised its discretion. *In re Marriage of Miles* (1977), 173 Ind.App. 5, 9, 362 N.E.2d 171, 174.

We find sufficient evidence to support the trial court's conclusion that the covenant was an enforceable provision of the contract. CHS' sole shareholder, Reiherzer, sought protection from the exact course of action which ensued, namely, OVRS' inducement of Unicare to terminate the Medco contracts. Reiherzer's demand for the clause resulted from prior business dealings with Scheller, Jobes, and Weber in a joint venture/partnership. The trial court found that Scheller, Jobes, and Weber attempted to lower Reiherzer's percentage of profits after negotiations with a hospital appeared to be leading to a lucrative agreement. The covenant was limited to one year following the termination of the CHS/Medco contract. OVRS was prohibited only from servicing Owensboro Medco and Henderson Medco. No other limitations were imposed on OVRS' business. We find sufficient evidence in the record to support the trial court's conclusion that the cove-

nant was reasonable and, therefore, enforceable.

## IV.

■■■ The fourth issue is whether the written contract provided for mutuality of obligations. OVRS argues that there should be a additional mutuality of obligation for the covenant not to compete, other than that required in the oral contract. However, we have already confirmed that no oral contract existed. Therefore, we determine whether the management agreement as a whole lacked mutuality, rather than separately considering those obligations provided in the covenant not to compete.

■■■ Mutuality of obligations is the doctrine requiring both parties to a contract to be bound to perform. Unless each party to the contract has assumed a legal obligation to the other, the contract is lacking in mutuality. *David Roth's Sons, Inc. v. Wright & Taylor, Inc.* (1961), Ky., 343 S.W.2d 389. The trial court found the management agreement to be a binding and enforceable contract under which both sides were obligated. OVRS serviced the Medco establishments, and CHS paid fifty percent of the profits to OVRS. The trial court did not err in finding mutuality.

## V.

■■■ The fifth issue raised is whether the trial court erred in finding that CHS did not terminate the management agreement. OVRS contends Reiherzer terminated the management agreement in March of 1993. This termination occurred after Reiherzer received notice indicating that Jobes and Weber were resigning as officers of DHS and that they intended to develop a competing business. DHS was a corporation developed by Jobes, Weber, Reiherzer and Scheller to service another health care facility and to act as a conduit by CHS for all money received under the Medco contracts.

CHS states that Scheller, on behalf of OVRS, provided services to the Medco facilities from January 1992 until March 4, 1993. On March 4, 1993, OVRS terminated Scheller's employment, and CHS asserts that no

other employee of OVRS serviced the Medco facilities. CHS argues it was no longer obligated to pay OVRS at that point.

In its reply brief, OVRS argues that another OVRS employee also serviced the Medco facilities, that there is no evidence CHS demanded OVRS to replace Scheller, and that no one at CHS complained about OVRS's failure to provide the services. This argument begs us to reweigh the evidence, which is something we may not do. *See Donavan,* 537 N.E.2d at 50. Therefore, we find no error in the trial court's holding.

## VI.

The final issue on appeal is whether the trial court erred in finding that neither CHS nor Scheller breached a fiduciary duty owed to OVRS. OVRS argues that either CHS or Scheller breached a duty to disclose to OVRS that a certificate of need ("CON") was no longer necessary to secure the Medco contracts.

First, OVRS maintains that Steve Marshall, the Vice President for Ancillary Services of Unicare, told either OVRS or Scheller that a CON was not needed. OVRS argues that if Reiherzer knew a CON was no longer necessary, then he was obligated to notify OVRS. OVRS contends that the parties entered into a joint venture and that a fiduciary duty is imposed on fellow joint venturers.

CHS argues that the relationship between OVRS and CHS was not a joint venture, and, therefore, did not create a fiduciary duty between the parties. Additionally, CHS focuses upon Reiherzer's testimony in which he stated he was never told by Marshall that Unicare did not require a CON.

OVRS is asking us to determine whether Marshall or Reiherzer is telling the truth. We would have to reweigh the evidence and judge the credibility of the witnesses to make this determination. As previously stated, we may not engage in such a practice. *See Donavan,* 537 N.E.2d at 50.

■ Second, OVRS argues that Scheller breached his duty as an agent of OVRS to disclose the information about the CON. Furthermore, if Scheller knew the CON was

not necessary, then Scheller was negligent in executing the management agreement and the covenant. OVRS argues that Scheller's action constituted negligence for two reasons. First, Scheller did not have the authority to execute the management agreement and was acting in bad faith. Second, Scheller erred in executing the agreement in light of OVRS' contention that it was "being forced" into the agreement "in part, because it had been led to believe that a Certificate of Need was absolutely necessary to secure a contract with Unicare." Appellant's brief, p. 36.

In its third-party defendant brief, Scheller argues that he did not breach his duty to OVRS. Scheller contends he entered into the management agreement, including the covenant, with the express or implied authority of OVRS. We agree.

The trial court concluded that "Scheller, as Vice President and Chief Operating Officer, had either actual or implied authority to execute the Management Agreement, including the non-compete provision, for OVRS." Record, p. 426. We find sufficient evidence in the record to substantiate the trial court's finding. Scheller testified that his duties included running OVRS, increasing OVRS' business, hiring and firing personnel, and signing checks. Scheller testified that he discussed portions of the agreement draft with Jobes and that Jobes was not surprised by Reiherzer's demand for a noncompetition provision. Scheller testified he prepared the language of the covenant with the authority of Jobes. Finally, Scheller believed he actual authority from Jobes to execute the agreement. Therefore, the trial court's conclusion was supported by the facts and was not clearly erroneous. *See DeHaan,* 572 N.E.2d at 1320.

## VII.

■ The sole issue raised by CHS on cross-appeal is whether the trial court erred in the amount of damages awarded to CHS under the contract. Specifically, CHS contends it is entitled to 100% of one year's lost profits, in accordance with OVRS' breach of the covenant not to compete.

In its findings of fact, the trial court determined:

"25. The profits from the Medco Contracts for 1992 were One Hundred Sixty Thousand Nine Hundred Twenty–Five Dollars ($160,925.00). The revenues from the Medco Contracts for the months of January through August 1993 increased an average of Three Thousand Seven Hundred Sixty–Two Dollars ($3762.00) per month."

Record, p. 425. The trial court awarded $61,196.71 in damages which included prejudgment interest.

When a party asserts that damages awarded for a breach of contract are inadequate, we may not reverse if the award is within the scope of the evidence before the trial court. *Tomahawk Village Apartments v. Farren* (1991), Ind.App., 571 N.E.2d 1286, 1295. In our review, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Id.*

The testimony at trial did not provide a definitive amount of lost profits, but was rather complex. Reiherzer's testimony attempted to demonstrate that CHS lost profits in an amount between $160,925.00 and $205,000.00. On cross-examination, however, Reiherzer admitted that his calculations did not include expenses or salaries. The trial judge was free to reject Reiherzer's estimate in light of the inability of Reiherzer to demonstrate its accuracy. On our review of the record, we cannot state that the damage award was not within the scope of evidence before the trial court. *See Tomahawk Village*, 571 N.E.2d at 1295. Therefore, we may not reverse the trial court's award.

For the foregoing reasons, the judgment of the trial court is affirmed in all respects.

AFFIRMED.

KIRSCH and STATON, JJ., concur.