## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2017, 8:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel W. Sherman
Valparaiso, Indiana

ATTORNEYS FOR APPELLEES

Robert A. Welsh
Morris A. Sunkel
Connor H. Nolan
Harris Welsh & Lukmann
Chesterton, Indiana

John E. Hughes
Kevin G. Kerr
Hoeppner Wagner & Evans, LLP
Valparaiso, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Douglas W. Klemz,

*Appellant-Cross/Appellee-Respondent,*

v.

Horizon Bank, *et al.*,

*Appellees-Cross/Appellants-Petitioners.*

November 15, 2017

Court of Appeals Case No.
64A05-1611-TR-2617

Appeal from the Porter Superior Court

The Honorable William E. Alexa, Judge

The Honorable Katherine R. Forbes, Magistrate

Trial Court Cause No.
64D02-1406-TR-5262

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Beneficiary/Cross-Appellee, Douglas Klemz (Douglas), appeals the trial court's Order, distributing the assets of the Larry A. Klemz Trust Agreement, in accordance with the proposed allocation submitted by the Appellee-Successor Trustee, Horizon Bank (Horizon), and with the approval of the Appellees-Beneficiaries/Cross-Appellants, Justin Klemz (Justin) and Brian Klemz (Brian).

We reverse and remand.

## ISSUES

Douglas presents us with one issue on appeal, which we restate as follows: Whether the trial court erred in approving the distribution of the assets of the Larry A. Klemz Trust (Trust) as proposed by the Successor Trustee.

On Cross-Appeal, Justin and Brian present this court with one issue, which we restate as: Whether Douglas breached his fiduciary duty as Trustee of the Trust.

## FACTS AND PROCEDURAL HISTORY

Larry Klemz (Larry) was a life-long entrepreneur and businessman, with real estate holdings and a printing company, Home Mountain Publishing (HMP). On March 8, 2005, Larry established the Trust, which was amended and restated in its entirety on April 15, 2009, and March 11, 2013, respectively. The

Trust instrument created a Business Trust and a Residuary Trust. The Business Trust owned the stock and membership of HMP, the entity that operated the printing business, and 5-K Run, LLC, the entity that owned the real estate housing HMP. The Residuary Trust contained Larry's remaining non-business assets. Pursuant to the terms of the Trust, Larry and Douglas were co-trustees, with Douglas, Justin, and Brian as designated primary beneficiaries. Upon Larry's passing, Douglas would receive a 90% interest in the Business Trust, with Brian and Justin each receiving a 5% interest. Douglas had the first option to purchase both HMP and 5-K Run, and thereby become the sole owner of the Business Trust's assets. The terms of the Trust further specified that the Residuary Trust would distribute no more than $10,000 to each of Larry's eight grandchildren, not to exceed 10% of the net taxable value of the property then constituting the Trust estate. Following these advancements and factoring any advancements made to Douglas, Brian, or Justin prior to Larry's death, the remaining balance of the Residuary Trust was to be distributed with 60% to Douglas, and 20% each to Brian and Justin.

[6] Upon Larry's passing on October 12, 2013, Douglas became the sole Trustee of the Trust and the operating manager of HMP and 5-K Run. Intending to carry on the family business, Douglas communicated with suppliers, buyers, and creditors of the company while managing the day-to-day operations. On November 19, 2013, Douglas executed a quitclaim deed to convey ownership of the real estate property at 3102 Cascade Drive (the Cascade Property) from the Residuary Trust to an LLC owned by himself. Immediately prior to

transferring the Cascade Property, Douglas used $135,000 of the Trust's funds to pay off the mortgage on the property.

[7]     On June 16, 2014, Brian and Justin filed a petition to docket the Trust and to remove Douglas as the Trustee because of a perceived breach of his fiduciary duties as Trustee. Finding that Douglas had conveyed property from the Trust to his wholly owned limited liability company, had kept income from this Trust asset for his personal use, and had not notified the other beneficiaries of this transfer, the trial court granted the petition on January 23, 2015. In the course of the litigation, the beneficiaries stipulated to the appointment of Horizon as the Successor Trustee, while Douglas continued as the operating manager of HMP and 5-K Run.

[8]     During the summer of 2015, Douglas expressed his intention to exercise his option to purchase the assets of the Business Trust. As a result of protracted negotiations, on August 24, 2015, Horizon and Douglas entered into two contracts, a Corporate Asset Purchase Agreement and a Real Property Purchase Offer (collectively, Agreements) to purchase certain assets from the Trust. The Corporate Asset Purchase Agreement provided for the sale of HMP to Douglas for the consideration of $400,000, "plus or minus allocations for inventory, accounts receivable, accounts payable and cash on hand as of the date of closing[,]" and subject to the "following contingencies and conditions:"

> a. This Agreement is contingent upon the purchaser obtaining the necessary financing in the amount of $200,000 at 5% interest;

b. This Agreement is wholly contingent upon the Purchaser's contemporaneous purchase of the real estate commonly known as 3602 Enterprise Avenue, Valparaiso Indiana upon which premises the Corporation is currently located;

c. Any sale, transfer, and/or assumption as contemplated by the terms of this Agreement is wholly contingent upon the approval of said terms by each creditor and the [trial court].

(Appellant's App. Vol. III, pp. 8, 10).  In executing the Corporate Asset Purchase Agreement, the parties agreed that "[t]ime is of the essence.  Any time periods specified in this Agreement and any [sic] are calendar days and shall expire at midnight of the date stated unless the parties agree in writing to a different date and/or time."  (Appellant's App. Vol. III, p. 12).

[9]     In the corresponding Real Property Purchase Offer, Douglas agreed to purchase 3602 Enterprise Avenue for the amount of $1.7 million, contingent on Douglas "obtaining the necessary financing in the amount of $250,000 at 5% per annum for a period of time not to exceed 10 years, [Douglas'] completion of the contemporaneous purchase of the corporate assets of [HMP] and obtaining the approval of the [trial court]."  (Appellant's App. Vol. III, p. 13).  The parties agreed that the "closing of the sale shall be on or before AUGUST 31, 2015, unless an extension of time is mutually agreed to in writing and signed by all parties.  A reasonable extension of time shall be allowed for correcting defects in title and obtaining [c]ourt approval for a sale."  (Appellant's App. Vol. III, p. 13).

[10]  In light of Brian's and Justin's continued opposition to the terms of the sale, Horizon, as Successor Trustee, filed a petition on September 11, 2015, seeking the trial court's approval to sell the assets of HMP and 5-K Run in accordance with the terms of the Agreements, as executed on August 24, 2015. Commencing September 21, 2015, the trial court conducted a three-day trial on Horizon's petition and Brian's and Justin's allegations that Douglas had breached his fiduciary duties as trustee. On March 4, 2016, while the parties were still awaiting the trial court's ruling after the September 21, 2015 hearing, Horizon filed its petition to complete the sale of assets of 5-K Run and HMP pursuant to the terms of the Agreements, previously filed, and requested the trial court to "take immediate action to consent to the sale and allow it to be completed at the earliest opportunity." (Appellant's App. Vol. III, p. 19). Again, Brian and Justin opposed the completion of the sale, arguing that the Agreements submitted by the Successor Trustee are not enforceable in that "the Successor Trustee's testimony of the 'purchase price' and [Douglas'] testimony of the purchase price differed by more than $500,000." (Appellant's App. Vol. III, p. 36).

[11]  On March 8, 2016, the trial court issued its written order following its September 21, 2015 hearing. In its order, the trial court concluded, in pertinent part, as follows:

> 2. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the Cascade Property. The [c]ourt finds no misappropriation of Cascade or of rental income.

3. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the sale of the Calumet Property.

4. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to disclosure of information. All information was turned over to Brian and Justin. However, Brian and Justin did have to file Motions before the [c]ourt and are entitled to fees for that action.

5. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the collection of debt owed by [HMP] to the Trust.

6. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to oral instructions.

7. The [c]ourt finds Brian and Justin have no interest in, and, therefore, no right to the profits of [HMP]. It appears that neither Justin nor Brian was interested in the day to day operations of the business. Other than the proceeds of the sale of the business assets of share of stock, they had no expectancy or interest in the day to day operations of [HMP]. . . . The only operational interest they could possibly benefit from was that the financial condition of the business would be roughly reflected in the sale price. The Trust held the stock to which they held a minority interest. The [c]ourt rejects their arguments and hereby approves the sale of the business known as [HMP], and the real estate located at 3602 Enterprise Drive, Valparaiso, IN, to Larry

Klemz[1] under the terms set in the pleading seeking [c]ourt approval.

(Appellant's App. Vol. II, pp. 19-20).

[12] After the trial court's March 8, 2016 order, Horizon and Douglas proceeded to finalize the values on the Agreements in preparation of closing. Meanwhile, Douglas continued to manage the day to day operations of HMP. As such, on April 27, 2016, Douglas emailed Horizon, Brian, and Justin, notifying them:

There are a handful of elements to determine as of the date of closing: Assets – cash on hand, inventory and accounts receivable and the Liabilities – short and long term liabilities.

You've seen the preliminary numbers that I forwarded on April 20th. Based on the snap shot at that moment in time, Justin and your combined 10% interest in the real estate and the business is about $30,933.60.

My recommendation is that you accept that number and get the deal done. These are fair numbers based on the negotiated agreements between [Horizon] and I and, I guarantee, they will not improve with time. As Justin is aware, [HMP] has purchased a press which adds a significant dollar amount to the liabilities of the Corporation. The press purchase is a good and necessary decision for the business; however, it does not improve the value of the shares at all.

---

[1] All parties agree that the trial court made a scrivener's error and the sentence should read, in part, "and the real estate located at . . . to Douglas[.]"

(Appellees' App. Vol. II, p. 44).

[13] During the continued negotiations between Horizon and Douglas, an inventory of HMP's personal property was prepared as of May 31, 2016, and Douglas submitted to Horizon, as Successor Trustee, the bank statements for HMP and 5-K Run, accounts receivable and accounts payable for HMP. In the midst of these negotiations, on June 3, 2016, Douglas filed a petition for relief and request for hearing further to the Trust and the trial court's March 8, 2016 ruling. In his petition, Douglas alerted the trial court to a manifest disagreement with Horizon's interpretation of the Agreements. Specifically, Douglas informed the trial court that he had "always understood the Corporate Asset Purchase Agreement to be an Asset Minus Liabilities sale," while the Successor Trustee advised him that it "interprets the [Corporate Asset Purchase Agreement] to be an 'Asset Minus Accounts Payable (only) sale.'" (Appellant's App. Vol. IV, p. 5). This difference in interpretation "increases the sale price to [Douglas] by over $600,000[.]" (Appellant's App. Vol. IV, p. 6). Under these conditions, Douglas presented to the trial court that he could not "financially absorb that increase in sales price[.]" (Appellant's App. Vol. IV, p. 7).

[14] Five days following the filing of his petition, Douglas entered into a loan agreement with 1st Source Bank to finance the purchase and installation of the printing press, mentioned in Douglas' April 27, 2016 email, for a total amount of $636,442. In exchange for the loan amount, 1St Source Bank obtained a secured interest in the assets of HMP and a mortgage encumbering the real estate owned by 5-K Run.

[15] In response to Douglas' petition, on June 10, 2016, Horizon filed a petition requesting the trial court to grant the specific bequests to the grandchildren, as provided under the Trust, and seeking specific guidance with respect to the payment of the Trust's tax liabilities. On June 30, 2016, Horizon filed a second petition, requesting the trial court to adopt its interpretation of the Corporate Asset Purchase Agreement. Subsequently, on July 12, 2016, Horizon filed a petition to resign as Successor Trustee.

[16] On September 21, 2016, the trial court heard argument by all parties on the issues presented by the parties' petitions and issued its order on October 18, 2016, which reflected, in part:

> 1. The Corporate Asset Purchase Agreement dated the 24th day of August, 2015, between the Successor Trustee and [Douglas] is not ambiguous as approved by the [c]ourt in its March 8, 2016 Order.
>
> * * * *
>
> 5. The effective date of closing for the [Corporate] Asset Purchase Agreement and the Real Estate Agreement shall be May 31, 2016, with the actual closing to occur at the earliest opportunity.
>
> * * * *
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the [c]ourt:

1. The petition of [Douglas] to interpret the Corporate Asset Purchase Agreement dated the 24th day of August, 2015 as an "asset minus liabilities" sale is Denied. The [c]ourt finds no ambiguity in the Agreement and, accordingly, no extrinsic evidence is admitted into the record. . . . The transaction shall close as early as feasible with an effective Closing Date of May 31, 2016.

(Appellees' App. Vol. II, pp. 3, 4). That same day, October 18, 2016, 1st Source Bank intervened in the proceedings.

[17] The following day, October 19, 2016, Horizon filed a petition requesting an emergency hearing, informing the trial court of HMP's cash flow problems and Douglas' continued refusal to close on the sale pursuant to the Agreements. Horizon also advised the trial court that "1st Source Bank continues to demand that there be an injection of funds from the [T]rust to assist the Business in continuing its operation or it will commence legal action to demand immediate payment of any and all obligations owed to them by said entities." (Appellant's App. Vol. VII, p. 4).

[18] Four days later, on October 26, 2016, the trial court conducted a hearing on Horizon's petition. During the hearing, Horizon alerted the trial court that it had received a notice of default from 1st Source Bank with respect to HMP's indebtedness, which advised Horizon that it was pursuing foreclosure proceedings and the appointment of a receiver. The Successor Trustee also testified to HMP's cashflow problems and the difficulties in getting the Agreements closed. Upon questioning by Douglas, the Successor Trustee

admitted not knowing whether the contingencies of the Corporate Asset Purchase Agreement had been satisfied and conceded that Horizon did not have a "written consent from 1st Source Bank to move forward with the sale." (Transcript p. 33). The trial court issued its Order on the emergency hearing on November 4, 2016, concluding:

1. The [c]ourt grants [Horizon's] request that [Douglas] receive, as his distribution, the business and the real estate, assets of the Business Trust and the funds that are shown on [Horizon's] proposed allocation which is attached and made a part of this Order. This will allow [Douglas] to continue to carry on the family business. [Douglas] should be able to complete the purchase from his share of the Residuary Trust.

2. That all of the remaining funds shall be distributed to [Brian] and [Justin] pursuant to [Horizon's] proposed allocation which the [c]ourt has now adopted.

3. That while the [c]ourt has allowed for $80,000.00 to be held for fees and expenses, it is not entering [o]rders, at this time, as to the exact amounts and distributions. Said sums shall be held pending further [o]rder of [c]ourt.

(Appellant's App. Vol. II, p. 23).

Douglas now appeals. Brian and Justin cross-appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[20]   In reviewing a trial court's order containing specific findings, the specific findings control only as to the issues they cover, and a general judgment standard applies to any issues upon which the trial court has not made findings. *In re Estate of Stayback*, 38 N.E.3d 705, 710 (Ind. Ct. App. 2015). We review such findings by determining whether the evidence supports the findings and whether the findings support the judgment. *Id.* We will reverse only when the judgment is shown to be clearly erroneous, *i.e.*, when it is unsupported by the findings of fact and conclusions entered thereon, or when the trial court applies an incorrect legal standard. *Id.* We defer substantially to the trial court's findings of fact, but we evaluate conclusions of law *de novo*. *Id.*

## II.  *Division of the Trust*

[21]   In its Order on "Successor Trustee's Petition for Emergency Hearing with respect to the Corporate Assets and the Real Property Purchase," issued on November 4, 2016, the trial court granted Horizon's distribution of the Trust as "shown on [Horizon's] allocation which is attached and made a part of this Order." (Appellant's App. Vol. II, p. 23). While the trial court omitted to physically attach Horizon's allocation, the proposed allocation had been made part of Horizon's Petition and all parties appear to be in agreement that the trial court "presumably" referenced Horizon's exhibit in its Order. (Appellant's Br. p. 15). During the hearing preceding the trial court's Order, the parties revisited the provisions of the Corporate Asset Purchase Agreement and the Real Property Purchase Order in light of the recent cash flow problems of HMP and 1st Source Bank's demand for payment on HMP's indebtedness in the amount

of $1,091,714 and 5-K Run in the amount of $1,336,811. Again, Horizon insisted that it was "trying to close under the terms and conditions of the" Agreements and requested the trial court to approve the sale in accordance therewith. (Tr. p. 23). Douglas disputed the terms of the Agreements and the compliance with the contingencies specified therein.

[22] On appeal, Douglas now contends that the "Agreements that the trial court attempts to force upon the parties are unenforceable on their face." (Appellant's Br. p. 16). Referencing the drastically changed circumstances with the appearance and actions of 1st Source Bank, Douglas maintains, among other arguments, that because 1st Source Bank's court-appointed receiver took possession of the assets of HMP and 5-K Run, no consideration exists to support the Agreements. Consequently, there is no printing business to purchase and continue. Ignoring recent developments, Horizon, as well as Brian and Justin, argue that the trial court's allocation and distribution of Trust assets should be affirmed.

[23] During the hearing, counsel for 1st Source Bank confirmed that it had notified the Successor Trustee of HMP's and 5-K Run's indebtedness and default and advised Horizon that it was "currently working on the actions to foreclose on the real estate and the equipment and other assets. We're going to ask to have a receiver appointed as well so those will be on file if not today, tomorrow." (Tr. p. 4). However, despite the parties' awareness of these developments and the trial court being notified of concurrent important proceedings in a different tribunal, the trial court failed to take the opportunity to examine the record.

Pursuant to Indiana Trial Rule 201, a court "may take judicial notice on its own" of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned;" and of the existence of "records of a court of this state." In *Fisher v. State*, 878 N.E.2d 457, 462 (Ind. Ct. App. 2007), we determined that "it is clear that Indiana appellate courts take judicial notice of records on file with that court in relation to a related proceeding." *See also In re Paternity of P.R.*, 940 N.E.2d 346, 349 (Indiana Trial Rule 201 allows courts to judicially notice records beyond those in the cases before them); *Pigman v. Ameritech Pub., Inc.*, 650 N.E.2d 67, 69 (Ind. Ct. App. 1995). Both Douglas and Horizon included in their appellate appendices certain orders issued by the trial court in the cause of 1st Source Bank against HMP, *et al.*, which unquestionably establish that all assets of HMP and 5-K Run have entered into receivership to satisfy 1st Source Bank's secured debt, and have been approved by the trial court on January 4, 2017, to be auctioned off. As a result, HMP's business is now closed and all assets of HMP and 5-K Run have been sold.

[24] Without even discussing the trial court's omission to inquire into the satisfaction of the Agreements' contingencies and conditions, we find that the Agreements can no longer be approved and enforced as written as no consideration exists. To have a legally binding contract there must generally be an offer, acceptance, and consideration. *Ind. Dept. of State Revenue v. Belterra Resort Indiana, LLC*, 935 N.E.2d 174, 179 (Ind. 2010). To constitute consideration, there must be "either a benefit to the party making the promise,

or a loss or detriment to the party to whom the promise is made." *OVRS Acquisition Corp. v. Cmty. Health Servs., Inc.*, 657 N.E.2d 117, 126 (Ind. Ct. App. 1995), *trans. denied*. In the end, "consideration—no matter what its form—consists of a bargained-for exchange." *Belterra Resort Indiana, LLC*, 935 N.E.2d at 179. In exchange for the promise to pay $400,000, Douglas wanted to obtain the benefit of HMP's and 5-K Run's ownership from the Successor Trustee. However, due to the foreclosure proceedings instituted by 1st Source Bank, the Trust no longer includes HMP and 5-K Run and, therefore, Horizon is not in a position to transfer ownership of these assets to Douglas. Thus, lacking consideration, the Agreements are not valid.[2] Accordingly, the trial court erred in granting the distribution of the assets in accordance with the provisions of the Agreements.[3] We reverse the trial court's Order and remand to the trial court to calculate a new distribution and allocation of the remaining assets in the Trust, if any, in accordance with the provision of the Trust instrument.

---

[2] Although Horizon did not file a complaint for specific performance, it should be noted that when the subject matter of a contract is sold to an unrelated third party, it is beyond the control of the parties and the court may not grant specific performance. *See UFG, LLC v. Southwest Corp.*, 848 N.E.2d 353, 361 (Ind. Ct. App. 2006), *trans. denied*. Accordingly, because no complaint for specific performance was filed, we will not address the parties' allegations with respect to the impossibility of performance and damages. *See Bernel v. Bernel*, 930 N.E.2d 673, 683 (Ind. Ct. App. 2010) (impossibility is an affirmative defense to performance of an executory contract and is generally invoked as a defense to an action for damages), *trans. denied*.

[3] Throughout their briefs, both Horizon, on the one hand, and Brian and Justin, on the other, argue that we should affirm the trial court because the trial court had ordered the parties to use May 31, 2016, as the effective closing date for the Agreements. Therefore, they argue that the sale price can be calculated and ownership can be transferred as of that effective date, regardless of later developments. Although we agree that in so far that the trial court ordered May 31, 2016 as the closing date of the Agreements, nevertheless, we would still conclude that the Agreements are not enforceable as non of the contingencies specified in the Agreements—most notably 1st Source Bank's approval to the sale—were satisfied.

In their cross-appeal, Brian and Justin contend that the trial court erred in concluding that Douglas did not breach his fiduciary duty as Trustee.

However, in its order of March 8, 2016, the trial court concluded, in part, that:

> 2. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the Cascade Property. The [c]ourt finds no misappropriation of Cascade or of rental income.
>
> 3. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the sale of the Calumet Property.
>
> 4. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to disclosure of information. All information was turned over to Brian and Justin. However, Brian and Justin did have to file Motions before the [c]ourt and are entitled to fees for that action.
>
> 5. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to the collection of debt owed by [HMP] to the Trust.
>
> 6. The [c]ourt finds that [Douglas] did not breach his fiduciary duty with respect to oral instructions.

(Appellant's App. Vol. II, pp. 19-20).

Accordingly, the issue of Douglas' purported breach of fiduciary duty was conclusively decided by the trial court in its order of March 8, 2016. Although the trial court failed to make a specific determination in writing with respect to

this individual claim of breach of fiduciary duty for the order to be a final judgment as to that claim, the trial court never ruled on the issue of fiduciary duties again even though Brian and Justin reiterated this claim during the course of the proceedings. *See* Indiana Appellate Rule 2(H). Even assuming that the issue of Douglas' purported breach was not finally decided upon in the trial court's March 8, 2016 order, the issue would be more appropriately raised after a final decision is reached in this cause. *See Shuler v. Estate of Botkins*, 970 N.E.2d 164, 167 (Ind. Ct. App. 2012) ("[O]rders issued by a probate court are not final until the estate is closed.")

## CONCLUSION

[28] Based on the foregoing, we conclude that the trial court erred in approving the distribution of the Trust, as proposed by the Successor Trustee. We further conclude that the cross-appeal is not properly before us.

[29] Reversed and remanded for further proceedings.

[30] Pyle, J. concurs

[31] Robb, J. concurring in part and dissenting in part with separate opinion

| | |
|---|---|
| Douglas W. Klemz, <br> *Appellant-Cross/Appellee-Respondent,* <br><br> v. <br><br> Horizon Bank, et al., <br> *Appellees-Cross/Appellants-Petitioners.* | Court of Appeals Case No. <br> 64A05-1611-TR-2617 |

**Robb, Judge, concurring in part and dissenting in part.**

[32]     I concur in the majority's decision with respect to the division of the trust. However, I dissent from the majority's decision that Brian and Justin's cross-appeal issue was "conclusively decided by the trial court in its order of March 8, 2016" and that the cross-appeal is not properly before us. *See* slip op. at ¶ 27.

[33]     Even if Brian and Justin's claim was "finally decided" by the March 8, 2016 order, *see id.*, an appeal of the trial court's disposition of that claim is not foreclosed. The March 8, 2016 order was not a final order. The fact that the trial court never ruled on the issue of Douglas' fiduciary duties again is immaterial. For purposes of deciding what is a final order, we do not look issue by issue – we look at the case as a whole. Appellate Rule 2(H) defines a "final

order" as an order that "disposes of all claims as to all parties."[4]  If an order does less than that, the trial court must make a specific determination in writing with respect to an individual claim for the order to be a final judgment as to that claim.  Following the March 8, 2016 order, the question of how to distribute the estate remained, a question addressed by the November 4, 2016 order.  The March 8, 2016 order did not dispose of all claims as to all parties, nor did the trial court make an express determination that there was no just reason for delay and direct entry of judgment as to Brian and Justin's claim.  Therefore, the March 8, 2016 was not a final judgment as to *any* claim; it was an interlocutory order. Brian and Justin's failure to appeal within thirty days of this interlocutory order did not waive their right to appeal the order.  *See Keck v. Walker*, 922 N.E.2d 94, 99 (Ind. Ct. App. 2010) ("A claim of error in an interlocutory order, even an interlocutory order which is appealable as of right, is not waived for failure to take an interlocutory appeal . . . .").

[34]  *Douglas'* Notice of Appeal designates as the appealed order or judgment *both* the March 8, 2016 and the November 4, 2016 interlocutory orders.  I would therefore decide the issue raised by Brian and Justin now in the interest of judicial economy.  But because the majority has chosen not to decide the issue, I reiterate and emphasize that Brian and Justin's claims of error in the March 8,

---

[4] Had the March 8, 2016 order been a final judgment disposing of all claims as to all parties, the case would have been closed and any further litigation would have borne a separate cause number.  That is not the case here.

2016 interlocutory order can be raised by a timely notice of appeal after a final order is entered in this case, whenever that might be. *See* slip op. at ¶ 27.

[35]