## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 21 2016, 8:56 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Tracy D. Knox | John D. LaDue |
| Brian E. Casey | John Conway |
| BARNES & THORNBURG LLP | Paul Edgar Harold |
| South Bend, Indiana | LADUE CURRAN & KUEHN LLC |
| | South Bend, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

B&R Oil Company, Inc. and Atlas Oil Company

*Appellants-Defendants,*

v.

William E. Stoler, et al.,

*Appellees-Plaintiffs*

January 21, 2016

Court of Appeals Case No. 71A03-1503-PL-114

Appeal from the St. Joseph Superior Court

The Honorable Jenny Pitts Manier, Judge

Trial Court Cause No. 71D05-1102-PL-34

**Altice, Judge.**

[1] This case arises out of a legal dispute between B&R Oil Company (B&R) and Atlas Oil Company (Atlas) (collectively, the Oil Companies) and eighteen of their gas station tenants (the Tenants). The Tenants claim, and the trial court

found, that an oral settlement agreement was reached at a November 2014 mediation. After the mediation, but before the written agreement was finalized, an unrelated legal dispute arose between B&R and two of the Tenants, William and Kathlyn Stoler (the Stolers) and Jeffery Levy, regarding the rights of first refusal in their respective leases. Counsel for the Oil Companies and the Tenants agreed to include language in the written settlement agreement providing that the settlement would not release the Stolers' and Levy's right-of-first-refusal claims. However, the Oil Companies subsequently refused to execute the written agreement and insisted on a full, unconditional release of claims, including specifically the right-of-first-refusal claims. The Tenants filed a motion to enforce the settlement agreement and, after a hearing, the trial court entered judgment in their favor. Specifically, the trial court concluded that an enforceable oral settlement was reached at the November 2014 mediation and that the settlement was limited to issues raised in the instant litigation. In other words, the Stolers' and Levy's right-of-first-refusal claims remained viable.

[2] The Oil Companies now appeal and argue that the trial court erred in concluding that the parties reached an enforceable oral settlement agreement at the November 2014 mediation because neither the representatives of the Oil Companies nor the representatives of the Tenants present on that date had settlement authority. They also argue that no enforceable settlement was reached because the parties did not agree on all material terms. The Oil Companies further argue that the trial court abused its discretion by refusing to

permit them to cross-examine the Tenants' counsel, John Conway, concerning who had settlement authority for the Tenants.

[3]     We affirm.[1]

## Facts & Procedural History

[4]     Atlas is a national fuel supply, logistics, and service company. B&R is a regional distributor of oil and gas and an affiliate of Atlas. At the time relevant to this case, B&R owned numerous retail gas stations in Indiana and Michigan, some of which they leased to the Tenants. The Tenants were also parties to gasoline supply agreements entered into with B&R and Atlas. This case stems from a legal dispute between the Tenants and the Oil Companies concerning ethanol sales between 2007 and 2009. The specifics of the dispute are not material to the case before us, but in short, the Tenants alleged that the Oil Companies artificially inflated the wholesale cost of ethanol they provided to the Tenants. As a result, the Tenants alleged that they were deprived of commissions from the sale of ethanol to which they were contractually entitled. In 2010, the Tenants filed suit against the Oil Companies in St. Joseph Superior Court claiming that B&R owed them commissions for the sale of gasoline.

[5]     After three years of litigation, the parties met for court-ordered mediation in February 2014. In attendance on behalf of the Oil Companies were William

---

[1] We held oral argument in this matter on December 3, 2015. We commend counsel on the quality of their written and oral advocacy.

Shaver, a non-lawyer, management-level employee of the Oil Companies; John Ortoleva, in-house counsel for the Oil Companies; and Dean Groulx, outside counsel for B&R. In attendance for the Tenants were attorneys Conway and John LaDue, and Tenants William Stoler, Craig Ferrara, and Tim Cira. During this mediation session, one of the Tenants settled his claims against the Oil Companies. Shaver signed the written settlement agreement on behalf of the Oil Companies. The remaining Tenants were unable to reach an agreement with the Oil Companies, and the litigation continued.

[6] The Oil Companies later filed a motion to sanction the Tenants for not having all of the Tenants physically present at the mediation. In their sanctions motion, the Oil Companies alleged that, unlike the Tenants, the Oil Companies' party representatives were physically present at the mediation. The trial court granted the motion and imposed a monetary sanction. On the same date, however, the Oil Companies filed a motion to withdraw their request for sanctions. The trial court granted the motion and vacated its order imposing sanctions.

[7] On November 4, 2014, the parties again met to try to settle the case. Shaver, Ortoleva, and Groulx again attended on behalf of the Oil Companies. Attorneys Conway and LaDue attended for the Tenants, as well as Tenants Stoler, Ferrara, and Cira. The parties disagree as to the outcome of this settlement conference. The Tenants assert that the parties reached an agreement as to all material terms. Conway testified that he was never told that anyone else from the Oil Companies needed to approve the terms of the

settlement. The Oil Companies claim that the parties came to an agreement on some issues that had previously prevented settlement, but they did not agree on all material terms of a settlement. Specifically, the Oil Companies assert that the parties did not agree on the nature and scope of the release to be executed. The Oil Companies further assert that the parties agreed that there would be no binding settlement until the agreement was reduced to writing and reviewed and approved by Michael Evans, the president and chief operating officer of Atlas. The trial court expressly rejected the Oil Companies' version of events and credited that of the Tenants.

[8] The parties agree that they reached an agreement on the following terms:

- The Oil Companies would pay Tenants a lump sum of money.
- The Oil Companies would make improvements to some of the Tenants' facilities.
- The Oil Companies would fund the settlement within thirty days.
- The Oil Companies would dismiss a related arbitration proceeding against Jim Wegner, one of the Tenants' witnesses and a former employee of the Oil Companies.
- The Tenants would dismiss the litigation with prejudice.
- Groulx would reduce the agreement to writing following the settlement conference.

[9] Groulx did not deliver a first draft of the written settlement agreement (the Written Agreement) to Conway until December 4, 2014—thirty days after the settlement conference. Conway contacted Groulx in the interim asking about

his progress on drafting the Written Agreement. Groulx apologized for the delay and requested wiring instructions from the Tenants, which Conway promptly provided. Because it appeared that progress was being made toward finalizing the settlement, the Tenants decided to waive the settlement term requiring the Oil Companies to fund the settlement within thirty days.

[10] Sometime between December 4 and December 12, the Stolers and Levy received notice from B&R that another company, Empire Petroleum Partners, LLC, had agreed to purchase substantially all of B&R's assets for $80 million. Because the asset purchase agreement triggered the Stolers' and Levy's rights of first refusal on the gas stations they leased from B&R, B&R sought to have the Stolers and Levy either waive their rights of first refusal or match the entire $80 million purchase price.

[11] The Stolers and Levy refused to waive their rights and, instead of matching the $80 million purchase price for all of B&R's assets, requested that B&R provide them with a price to purchase only their respective gas stations. When B&R refused to do so, the Stolers and Levy brought a separate lawsuit against B&R seeking to enforce their rights of first refusal. That suit is currently pending in the St. Joseph Circuit Court.

[12] The first draft of the Written Agreement Groulx emailed to Conway on December 4 contained a unilateral release of all of the Tenants' claims against the Oil Companies, running from the beginning of time through the "Effective Date" of the Written Agreement, which was listed as "December ____, 2014."

*Exhibit* 2B. Conway communicated to Groulx that the Tenants wanted the release to be mutual, i.e., that the Oil Companies should also execute a general and unconditional release of all claims against the Tenants. Groulx declined this request, and in an email dated December 11, 2014 proposed to include a release running from the Oil Companies to the Tenants "limited to freight, and ethanol and motor fuel pricing issues from 2007 through 2009." *Appellant's Appendix* at 366. Conway responded to Groulx's email the next day, asking for either mutual general releases or for the Tenants' release to also be limited to freight, ethanol, and motor fuel pricing from 2007 through 2009. In the same email, Conway made reference to the Empire asset purchase agreement, but the Stolers' and Levy's rights of first refusal were not mentioned.

[13] The Tenants subsequently accepted the draft language providing for a general release from the Tenants and a limited release from the Oil Companies, with one addition. In an email dated December 16, 2014, Conway indicated that "we accepted your release language but added a sentence clarifying that plaintiffs are not releasing any claims regarding their rights of first refusal with respect to the Empire transaction." *Id.* at 364. This sentence, which the parties refer to as "the Carve Out," reads as follows: "The parties agree that the release of claims does not release any claims involving the Plaintiffs' right of first refusal contained in their respective leases." *Exhibit* 2(B). Groulx did not object to the inclusion of this language in the Written Agreement. Two days later, on December 18, Conway had a telephone conference with Groulx, Ortoleva, and another of the Oil Companies' in-house lawyers, Philip Carbone. During the

conversation, the attorneys agreed to include the Carve Out in the written settlement agreement.

[14] Later that same day, at 4:07 p.m., Groulx emailed the final Written Agreement containing the Carve Out to Conway and copied Ortoleva and Carbone. In the same email, Groulx stated that "my client is prepared to sign and fund the settlement." *Appellant's Appendix* at 550. Seven minutes later, Conway responded: "This agreement is acceptable and I will obtain signatures." *Id.* Twenty-three minutes later, Groulx responded: "We spoke too soon on our end. We need to obtain approval for the proposed changes from management at Atlas before we can finalize the settlement." *Id.*

[15] The next day, in an email to Carbone on which Groulx and Ortoleva were copied, Conway wrote that the Tenants were ready to close on the settlement and that "[t]he resolution of the right of first refusal issue should not be tied to the completion of the settlement as you suggested." *Id*. at 555. In an email two days later, Carbone told Conway that the Oil Companies would "not agree to move forward with the proposed settlement unless the settlement agreement includes provisions for the Stolers and Levy to waive the right of first refusal in both of their respective leases." *Id.* at 554.

[16] The Stolers and Levy declined to waive their rights of first refusal, and on January 26, 2015, the Tenants filed their verified motion to enforce the settlement agreement. The Oil Companies filed their verified response on

February 6, 2015. A bench trial was held on February 10, 2015, at which both Conway and Groulx testified.

[17] Conway testified that he first became aware of Evans's purported involvement in the settlement when he received the Oil Companies' verified response to the motion to enforce the settlement agreement, which was signed by Evans. Conway also testified that the Oil Companies' representatives with settlement authority were present at the November 4 settlement conference and that an agreement was reached on all material terms that day. Groulx, on the other hand, testified that Evans, and only Evans, had settlement authority on behalf of the Oil Companies, and that the Oil Companies' representatives had conferred with Evans by telephone during breaks in the mediation that day. Groulx further testified that Evans's role had been communicated to Conway both before and during the mediation, and that the parties had agreed only on a framework for a proposed settlement in November 2014, and that Evans had not approved any settlement. When confronted with the facts that Evans had not been present at the February 2014 settlement conference and had not signed the agreement reached that day to settle one of the Tenants' claims, Groulx claimed that he had conferred with Evans by telephone during breaks on that date and that Evans had approved the resulting settlement.

[18] On March 5, 2015, the trial court entered a detailed order granting the Tenants' motion to enforce the Written Agreement and setting forth special findings and conclusions thereon. In the order, the trial court resolved the conflict between Conway's and Groulx's testimonies in Conway's favor, expressly finding him

to be a "credible witness." *Id.* at 22. The trial court also listed specific reasons for discounting Groulx's testimony that Evans was the only one with authority to enter into a settlement agreement for the Oil Companies. The trial court also found that Conway reasonably understood Ortoleva to be the person authorized to act as the Oil Companies' agent for settlement purposes. The trial court further found that the parties reached an agreement as to the material terms of the settlement at the November 2014 mediation, and that settlement was later memorialized in the Written Agreement. Finally, the trial court found that the settlement was limited to issues raised in the instant litigation, namely, freight charges and ethanol and motor fuel charges from 2007 through 2009. Thus, Stoler's and Levy's claims under their rights of first refusal remained viable. The Oil Companies now appeal.

## Standard of Review

At the Oil Companies' request, the trial court entered special findings and conclusions thereon pursuant to Trial Rule 52. We therefore apply a two-tiered standard of review, first determining whether the evidence supports the trial court's findings, and then whether the findings support the judgment. *Infinity Products, Inc. v. Quandt*, 810 N.E.2d 1028, 1031 (Ind. 2004). We will not disturb the findings or judgment unless they are clearly erroneous. *Id.*

"The particular clearly erroneous standard that is to be employed depends upon whether the appealing party appeals a negative or an adverse judgment." *Romine v. Gagle*, 782 N.E.2d 369, 376 (Ind. Ct. App. 2003), *trans. denied.* "A

negative judgment is one entered against a party who bears the burden of proof, while an adverse judgment is one entered against a party defending on a given question." *Serenity Springs v. LaPorte Cnty. Convention & Visitors Bureau*, 986 N.E.2d 314, 319 (Ind. Ct. App. 2013) (quoting *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied*). In this case, the trial court entered judgment in favor of the Tenants, i.e., the parties bearing the burden of proof at trial. *See OVRS Acquisition Corp. v. Cmty. Health Servs.*, 657 N.E.2d 117, 125 (Ind. Ct. App. 1995) (noting that a party seeking to establish the validity of a contract bears the burden of proving its existence), *trans. denied*. The Oil Companies are therefore appealing an adverse judgment. Accordingly, "we hold the trial court's findings clearly erroneous if they are not supported by substantial evidence of probative value." *Serenity Springs*, 986 N.E.2d at 319. Even if the evidence is substantial, we will reverse the judgment if we are left with a definite and firm conviction a mistake has been made. *Id.*

[21] Additionally, to the extent that our disposition of this case turns on the resolution of questions of law, our review is *de novo*. *See Zukerman v. Montgomery*, 945 N.E.2d 813, 818 (Ind. Ct. App. 2011). Whether a contract exists is ultimately a question of law. *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. Ct. App. 2011), *trans. denied*.

### 1. Authority

[22] "Indiana strongly favors settlement agreements and if a party agrees to settle a pending action, but then refuses to consummate his settlement agreement, the

opposing party may obtain a judgment enforcing the agreement." *Id.* As a general matter, a settlement agreement need not be in writing to be enforceable. *Id.* "Settlement agreements are governed by the same general principles of contract law as any other agreement." *Vance v. Lozano*, 981 N.E.2d 554, 558 (Ind. Ct. App. 2012).

[23] The Oil Companies' primary argument on appeal is that no binding settlement agreement was reached at the November 2014 mediation because the individuals present did not have settlement authority. "Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." *Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1302 (Ind. 1998) (quoting Restatement (Second) of Agency § 7 (1958)). Our Supreme Court has explained that there are two main classifications of authority: actual authority and apparent authority. *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000).

> Actual authority is created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Scott v. Randle*, 697 N.E.2d 60, 66 (Ind. Ct. App. 1998), *transfer denied*; *see* Restatement (Second) of Agency §§ 7, 33 (1958). Apparent authority refers to a third party's reasonable belief that the principal has authorized the acts of its agent, *Pepkowski v. Life of Indiana Ins. Co.*, 535 N.E.2d 1164, 1166-67 (Ind. 1989); it arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent, *id.*; *Drake v. Maid-Rite Co.*, 681 N.E.2d 734, 737-38 (Ind. Ct. App. 1997), *reh'g denied.*

*Id.*

[24] We first address the Oil Companies' argument that none of the representatives present at the November 2014 mediation had authority to settle on the Oil Companies' behalf. Specifically, the Oil Companies argue that the only party with actual settlement authority was Evans, and that neither Groulx nor Ortoleva had apparent authority.

[25] With respect to actual authority, the trial court expressly rejected the Oil Companies' claim that Evans possessed sole settlement authority. In support of its conclusion, the court gave several reasons for finding Groulx's testimony to that effect to be implausible. First, the trial court noted that Evans was not present in person at the February 2014 settlement conference. Instead, Groulx, Shaver, and Ortoleva attended on behalf of the Oil Companies, and Shaver, not Evans, signed the settlement reached that day with one of the Tenants. Moreover, the Oil Companies later filed a motion for sanctions against the Tenants for violating a local rule requiring the presence of a representative with full settlement authority. As the trial court noted, "[i]f Groulx's testimony is to be believed as to Evans' authority, he invoked the Court's extraordinary power to impose a sanction for a violation of a rule he himself was guilty of violating." *Appellant's Appendix* at 23. The court also noted that Groulx raised no objection to the Carve Out and that it was only *after* Groulx stated that his clients were ready to sign the Written Agreement that Groulx backtracked and stated that he needed consent from management.

[26] It is also noteworthy that Evans did not attend the November 2014 settlement conference, and unlike Ortoleva, he was not copied on any of the email traffic that followed. Indeed, Conway testified that he first became aware of Evans's involvement when the Oil Companies filed their response to the motion to enforce the settlement agreement. Additionally, Evans did not appear or testify at the evidentiary hearing in this matter. Under these facts and circumstances, the trial court's finding that Evans did not appropriate sole settlement authority to himself was not clearly erroneous.

[27] Nevertheless, the Oil Companies note that the trial court made no express finding that anyone present at the November 2014 had actual authority to settle the case on the Oil Companies' behalf. They note further that no evidence was presented of any words or actions of the Oil Companies that would lead Groulx, Ortoleva, or Shaver to believe that they had settlement authority or that they understood that they possessed such authority. We note, however, that such evidence is peculiarly within the knowledge of the Oil Companies, and without an admission of actual authority, the Tenants could rely only upon inference. By finding that Evans was not the only person with actual settlement authority, the trial court implicitly found that that at least one other person possessed such authority. Based on our reading of the trial court's order as a whole, it is apparent to us that the trial court believed that at least one of the Oil Companies' representatives present at the November 2014 mediation, whether it be Groulx, Ortoleva, or Shaver, had actual settlement authority. This inference was not clearly erroneous, and the Oil Companies' arguments to the

contrary are simply requests to reweigh the evidence and judge witness credibility, which we will not do on appeal.

[28] The trial court also made an express finding that Ortoleva had apparent authority. Specifically, the trial court found that:

> Defendants sent Groulx, Ortoleva and Sha[v]er to the Court-ordered mediation that occurred February, 2014. Ortoleva has not represented [the Oil Companies] in these court proceedings. The presence of Ortoleva and Sha[v]er at the Court-ordered mediation was reasonably understood by Conway, when considered in the light of all the evidence, as a representation by [the Oil Companies] that Ortoleva was a person authorized to act as [the Oil Companies'] agent and approve a settlement agreement for [the Oil Companies].

*Id.* at 24 (footnote omitted).

[29] The Oil Companies argue that Ortoleva's presence at the February and November 2014 mediations cannot support a finding of apparent authority because apparent authority must arise from the direct or indirect communications of the principal, not the actions of the agent. The Oil Companies argue further that apparent authority to settle cannot arise solely from Ortoleva's status as the Oil Companies' in-house attorney. In support of this argument, the Oil Companies direct our attention to *Koval*, in which our Supreme Court explained that "the sole act of retaining an attorney does not give the attorney the implied or the apparent authority to settle or compromise a claim in an out of court proceeding." 693 N.E.2d at 1301. Although retention of an attorney alone is not a manifestation by the client to third parties

that an attorney has apparent authority to settle, apparent authority may be conferred by other actions of the client. *Id.* at 1304.

[30] The Oil Companies' arguments on the subject of apparent authority misconstrue the basis for the trial court's findings. The trial court did not base its finding solely on Ortoleva's status as the Oil Companies' in-house attorney or on his mere presence at the mediations. Rather, it was the actions of the Oil Companies in sending Ortoleva, Shaver, and Groulx to the mediations as their representatives that formed the basis of the trial court's finding that Ortoleva was clothed with apparent authority to settle. By sending only these individuals to the February 2014 mediation, at which the parties were required to have representatives with full settlement authority present, the Oil Companies represented to the Tenants that the individuals present had such authority. The representation was bolstered when the Oil Companies filed a motion for sanctions against the Tenants for not having representatives with full settlement authority present at the February 2014 mediation. By making such a complaint, the Oil Companies implicitly asserted that their representatives at the mediation possessed such authority. In light of this sequence of events, when the Oil Companies sent the same representatives to the November 2014 mediation, it was reasonable for the Tenants to believe that at least one of those representatives still had settlement authority. Accordingly, the trial court's finding that Ortoleva had apparent authority to settle the case was not clearly erroneous.

[31] The Oil Companies also argue that no binding settlement agreement could have been reached at the November 2014 settlement conference because the Tenants' representatives lacked settlement authority. We note, however, that the Oil Companies did not raise the issue of the Tenants' settlement authority in their response to the Tenants' motion to enforce the settlement agreement. Nor did counsel raise the argument at the evidentiary hearing. During cross examination, counsel for the Oil Companies asked Conway, "[w]ho has settlement authority on your behalf? In your case, on your behalf, who has the authority to settle your claims?" *Transcript* at 52. The following exchange ensued:

> [Tenants' Counsel]: Objection. Mr. Conway is not a party to this lawsuit.
>
> The Court: What's the purpose of your—
>
> [Oil Companies' Counsel]: The point of that is the person who has settlement authority on his half [sic], we may not even know. The—the—B&R may not know who that person is, because it may not be somebody you deal with. The point is you deal with the lawyer face-to-face.
>
> [Tenants' Counsel]: Your Honor, I'm going to object. Whether the [Tenants] had settlement authority is not an issue. We're conceding we had—
>
> The Court: I think you're making an argument rather than a factual point. So sustained.

*Id.*

Although counsel for the Oil Companies asked about the Tenants' settlement authority, he did not make it clear in his response to the Tenants' objection that he sought to introduce such evidence to support an argument that there was no binding agreement because the Tenants lacked settlement authority. Instead, it appears that counsel for the Oil Companies sought to elicit such testimony simply to demonstrate that it is not always clear who has settlement authority in such negotiations. It is well-settled that "[a]n appellant who presents an issue for the first time on appeal waives the issue for purposes of appellate review." *Mid-States Gen. & Mech. Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 436 n.2 (Ind. Ct. App. 2004). Because the Oil Companies did not raise the issue of the Tenants' settlement authority at trial, it has been waived.

### 2. Material Terms

The Oil Companies next argue that even if the representatives at the November 2014 mediation had settlement authority, no enforceable oral agreement was reached on that date because the parties did not reach an agreement on all material terms. As this court has noted, "[i]f a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed." *Schuler v. Graf*, 862 N.E.2d 708, 715 (Ind. Ct. App. 2007) (quoting *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005)), *trans. denied*. Moreover,

[p]arties may make an enforceable contract which obligates them to execute a subsequent final written agreement. However, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. In other words, the document is understood to be a mere memorial of the agreement already reached and may not contain a material term that is not already agreed on.

*Sands*, 945 N.E.2d at 180 (citations omitted).

[34] The Oil Companies argue that the communications between Conway and Groulx following the November 2014 settlement conference demonstrate that the parties did not agree on at least one material term—the scope of the releases. According to the Oil Companies, the negotiations concerning the language of the releases amounted to continuing offers and counter-offers, indicating that no binding contract was formed at the November 2014 mediation. The Oil Companies argue further that the release was clearly material, and they cite federal case law for the proposition that the details of a release are an inherently material term in a settlement agreement.

[35] The evidence presented at trial supports the Oil Companies' claim that the parties continued to negotiate concerning the release language after the November 2014 mediation. Specifically, the first draft of the Written Agreement contained an unconditional, unilateral release of claims in the Oil Companies' favor. The Tenants responded by asking for mutual releases. The Oil Companies responded by proposing that the Oil Companies would release claims relating to relevant pricing issues from 2007 through 2009. Conway

responded that the releases should be mutual, and proposed either limiting the scope of the Tenants' releases in the same manner or agreeing to other language he proposed. Finally, Conway agreed to the limited release of the Oil Companies' claims and proposed the Carve Out, and Groulx and Ortoleva found this language acceptable.

[36] The fact that the parties did not immediately agree on the language of the Written Agreement does not conclusively establish that the parties did not reach an agreement on all material terms at the November 2014 mediation. Instead, the ongoing negotiations may simply indicate that the parties initially disagreed as to whether the proposed draft agreement accurately captured the material terms of the settlement reached at the mediation. In any event, we agree that the Tenants' release was unquestionably material; as the Oil Companies note, the release of the plaintiff's claims is among the most material terms in a settlement agreement. But the Tenants' release of their claims was not the subject of the post-mediation negotiations. Rather, the parties negotiated the language of the Oil Companies' release of its claims. Specifically, Groulx did not include any language releasing the Oil Companies' claims in the first draft of the Written Agreement, and the negotiations stemmed from Conway's efforts to include such language. But the Oil Companies asserted no counterclaims against the Tenants in the underlying litigation, and from our review of the record, it does not appear that the Oil Companies had any claims to bring against the Tenants. Under the facts and circumstances of this case, we cannot conclude that the Oil Companies' release of apparently nonexistent

claims is a material term. *See Wolvos v. Meyer*, 668 N.E.2d 671, 676 (Ind. 1996) (noting that "only essential terms need be included in order to render a contract enforceable").

[37] Furthermore, the evidence supports a conclusion that the parties reached an agreement with respect to the scope of the Tenants' release of their claims at the November 2014 mediation. Specifically, the trial court found that the parties agreed that the Tenants would release the claims asserted in the underlying litigation. The first draft of the Written Agreement provided that the Tenants would release all claims against the Oil Companies from the beginning of time through the Effective Date of the agreement, which was listed as "December ____, 2014." *Exhibit* 2B. Presumably, the Effective Date was to be the date the Written Agreement was executed. At the time the Written Agreement was first drafted, the Effective Date was not critical because no new claims had arisen following the November 2014 mediation. It was not until after the Tenants became aware of the Empire transaction and the dispute concerning the Stolers' and Levy's rights of first refusal arose that it became necessary to clarify that those claims had not been released. While the parties could have accomplished this by agreeing to an earlier Effective Date, Conway instead proposed the Carve Out.[2] The addition of the Carve Out prompted no objections from Groulx, Ortoleva, or anyone else at the Oil Companies, suggesting that the

_____

[2] For this reason, we are unpersuaded by the Oil Companies' argument that Conway's failure to change the Effective Date demonstrates that the parties did not intend to be bound until the Written Agreement was executed.

Carve Out reflected the agreement previously reached at the November 2014 mediation.[3]  The Oil Companies' arguments to the contrary are requests to reweigh the evidence and judge the credibility of witnesses, which we will not do on appeal.

### 3.  Admission of Evidence

[38]  The Oil Companies also argue that the trial court erred in refusing to permit them to question Conway concerning who had settlement authority for the Tenants.  This court reviews the trial court's rulings on the admission of evidence for an abuse of discretion.  *Decker v. Zengler*, 883 N.E.2d 839, 845 (Ind. Ct. App. 2008), *trans. denied*.  Accordingly, we reverse only where the decision is clearly against the logic and effect of the facts and circumstances presented. *Id.*

[39]  During cross examination, counsel for the Oil Companies asked Conway, "[w]ho has settlement authority on your behalf?  In your case, on your behalf, who has the authority to settle your claims?"  *Transcript* at 52.  Counsel for the Tenants objected, arguing that Conway was not a party to the lawsuit.  Counsel for the Oil Companies responded that the "point of that is the person who has settlement authority . . . we may not even know. . . .  B&R may not know who

---

[3] The Oil Companies also rely on language in the Written Agreement providing that "[t]his agreement may be signed in one or more counterparts and when taken together shall be deemed a complete agreement" for the proposition that the parties did not intend to be bound until the Written Agreement was signed.  Again, we are unpersuaded.  This language says nothing about the parties' intent to be bound; rather, it simply allows the parties to sign separate copies of the Written Agreement.

that person is, because it may not be somebody you deal with. The point is you deal with the lawyer face-to-face." *Id.* Counsel for the Tenants responded that the Tenants' settlement authority was not at issue. The court ultimately sustained the objection, explaining that it believed that counsel for the Oil Companies was making an argument rather than a factual point.

[40] On appeal, the Oil Companies argue that evidence concerning who had settlement authority for the Tenants was relevant because "[w]ithout authority to enter into a binding agreement for the absent [Tenants], the [Tenants] and counsel who participated in the November 4th meeting could not have reached a binding agreement." *Appellants' Brief* at 70. We note, however, that the Oil Companies did not make an offer of proof. As this court has noted, when the trial court rules that a witness may not testify on a certain subject, the proponent of the testimony must make an offer of proof to preserve the ruling for appellate review. *Bedree v. Bedree*, 747 N.E.2d 1192, 1196 (Ind. Ct. App. 2001), *trans. denied*. An offer of proof provides this court with the information necessary to consider whether the trial court's exclusion of the evidence was proper. *Id.* The failure to make on offer of proof results in waiver of the evidentiary issue. *Id.* Because the Oil Companies failed to make an offer of proof, their argument is waived.

[41] Judgment affirmed.

[42] Riley, J., and Brown, J., concur.