**TOMAHAWK VILLAGE APARTMENTS (Phase I) An Indiana Limited Partnership, Jonathan Piser, individually and as a general partner of Tomahawk Village Apartments (Phase I) and Indiana Limited Partnership, and the Lake County Trust Company as Trustee under Trust Number 1767, Appellants–Defendants,**

v.

**Ronald E. FARREN, Appellee–Plaintiff.**

No. 49A04–9003–CV–123.[1]

Court of Appeals of Indiana, Fifth District.

May 23, 1991.

 

---

1. This case was reassigned to this office on January 2, 1991.

Michael R. Franceschini, Steers, Sullivan, McNamar & Rogers, Indianapolis, Stephen B. Cohen, Skokie, Ill., for appellants-defendants.

Nancy L. Cross, Ancel, Miroff & Frank, Indianapolis, for appellee-plaintiff.

SHARPNACK, Judge.

Appellants, Tomahawk Village apartments, Jonathan Piser individually and as general partner of Tomahawk Village Apartments, and Lake County Trust Company (hereinafter "Tomahawk") appeal from a permanent injunction against them and an award of damages to them. We affirm.

The following is a statement of the facts most favorable to the judgment. Tomahawk Village Apartments is owned by the Lake County Trust company as Trustee under Trust No. 1767, which Trust holds legal title to the property. The beneficial owner of Tomahawk Village Apartments is defendant, Tomahawk Village Apartments, a limited partnership of which defendant, Jonathan Piser, is a general partner.

What is now Fox Run Apartments was originally owned by the Lake County Trust Company as Trustee under Trust No. 1768. The Fox Run Apartments were, until recently, known as Tomahawk Village Apartments, Phase II. Fox Run apartments has had several changes in ownership, most recently having been acquired by the plaintiff and appellee, Farren.

Fox Run has tennis courts and a basketball court and Tomahawk Village has a pool and clubhouse facility. These recreational facilities are the subject of cross easements created by a "Grant and Creation of Right to Share Adjoining Recreational Facilities" (hereinafter "grant") which reads in pertinent part:

That in pursuance of this agreement and in the joint and mutual consideration of Ten Dollars ($10.00) and other valuable consideration each paid to the other, the receipt whereof is hereby acknowledged, the 'Grantors' do hereby create, grant and convey unto 'Grantees', their ... successor and assigns, a non-exclusive easement, license, and right to use the property of 'Grantors', and the 'Grantees' do hereby create, grant and convey unto 'Grantors', their ... successors and assigns, a non-exclusive easement, ... and right to use the property of "Grantees", to wit: [the facilities in question] for ingress and egress and for the use, enjoyment and benefit of 'Grantees', their tenants, ... in common with 'Grantor', their tenants,....

The easement herein granted shall be perpetual and shall be an appurtenance to and shall run with the title to the lands of 'Grantees'....

\* \* \* \* \* \*

The 'Grantees' and the 'Grantors' further covenant and agree that all costs for maintenance, upkeep, repair and replacement of the premises to be used jointly by virtue of the mutual grants made herein shall be shared equally between them and the respective rules and regulations set by the owners of the respective premises shall govern the use and enjoyment of those facilities by all those hereinafter subject to the terms of this agreement.

The grant and a subsequent modification of it, which is not relevant to this case, were executed in 1973 at a time when the two complexes were under common management. Upon acquiring Fox Run in May of 1988, Farren initiated personal contact with Piser in an informal attempt to work out the logistics of the shared recrea-

tional facilities. On or about June 1, 1988, Piser informed Farren that, in addition to his liability under the grant for 50% of all repair and maintenance expenses, he would be required to pay a $300 pool security deposit for each of his 256 apartment units wishing to use the pool as a precondition of pool use. Upon informing Farren of the security requirement, Piser offered to sell Tomahawk Village Apartments to Farren for $30,000 per unit. When Farren responded that he had purchased Fox Run for $12,000 per unit, Piser told him that if he bought Tomahawk Village for thirty thousand per unit, he would still have paid a reasonable price for the combined properties. Piser later reduced the security requirement to $100 per unit. At that time, some of the leases for Fox Run only required a security deposit of $99.

Farren refused to pay the security deposit and Tomahawk denied Fox Run tenants use of the pool facilities despite extreme temperatures. They were not allowed to use the pool until the court issued a temporary restraining order on June 8, 1988, requiring that they be allowed access to the facilities.

In addition to attempting to institute a security deposit requirement, Piser also invoiced Farren for maintenance and repair expenses. Included among the charges for which Tomahawk invoiced Farren was a monthly "management fee" of $150 as well as costs for opening the pool, an operation which was performed by Tomahawk's employees. Farren did not pay immediately and questioned the legitimacy of some of the charges. On June 30, by letter of counsel, Farren expressed his questions regarding some of the charges and requested further documentation. However, Farren enclosed a check for $1000 to indicate his "good faith" and to be applied against what he owed until the particular charges could be clarified. Tomahawk retained the check but did not negotiate it.

Farren did not pay any of the expenses for which he was invoiced during the course of the litigation. Ms. Brown, Farren's property manager from April 1989 through the course of the litigation, testi-

fied that the reason she did not pay was that she disputed the legitimacy of, or was not provided with sufficient documentation for, several of the invoices from 1988. She also testified that when she tried to contact Mrs. Miller, Tomahawk's resident manager, and Sue Amonett, Tomahawk's property manager, she could not get them to talk about any problems regarding the pool.

The following is a brief procedural history of the controversy. On June 8, 1988, Farren was granted a temporary injunction against Tomahawk prohibiting it from charging a security deposit from Farren's tenants and requiring it to allow Farren's tenant's access to the pool and clubhouse facilities located on Tomahawk's premises. On June 24, 1988, the court entered a preliminary injunction.

On August 3, 1988, Tomahawk filed a counterclaim and third party claim alleging that Farren and his predecessor in title had breached the terms of the easements by failing to maintain the tennis courts located on Fox Run's property for the use and benefit of Tomahawk's tenants and by refusing to pay one half the costs of maintenance and repair of the pool and clubhouse facilities as required by the terms of the grant.

The court heard evidence and took the case under advisement on November 1, 1989. On November 14, 1989 the parties entered into a stipulation regarding amounts owed by each for maintenance and repair of their respective properties, although disagreeing on the legitimacy of certain charges. The court entered its findings of facts, conclusions of law and judgment the same day. The court's order awarded damages to Tomahawk in the amount of $8,751 after set-off. In addition, the court permanently enjoined the defendants from interfering with the use of the shared facilities by Farren's tenants subject only to uniform application of reasonable rules and regulations applicable to all users. The court specifically found that the security deposit required by defendants was not within the authority of the grant.

Tomahawk raises four issues for review which we restate as:

1. Does the grant prohibit Tomahawk from requiring a security deposit intended to discourage pool use by Fox Run Tenants and does the record support the court's finding that the deposit was arbitrary and intended to discourage pool use?

2. Did the court err in granting the injunction because Farren first breached the contract by refusing to pay his share of maintenance and repair costs and continued in his refusal to pay throughout the course of the litigation, thus relieving Tomahawk of its duties under the grant or requiring the court to deny his request for injunction due to his "unclean hands"?

3. Did Tomahawk waive the issue of whether the trial court committed error by not issuing an injunction against Farren to pay his share of maintenance and repair costs?

4. Were the damages awarded to Tomahawk on its counterclaim inadequate?

Farren pleaded, and the trial court found, that Tomahawk denied the tenants of Fox Run access to the pool facilities because he did not agree to post a security deposit. It is undisputed that Fox Run tenants have the right to use the facilities pursuant to the grant. There is no dispute that an injunction is proper if Fox Run tenants have been improperly denied this right. Tomahawk claims that the grant gives it the right to condition the use of the pool upon compliance with its rule requiring a security deposit. We must therefore decide whether Tomahawk had the authority under the grant to do so.

Our threshold consideration is whether the terms of the grant clearly state whether Tomahawk had the right to require a security deposit as a precondition to pool use. Our resolution of this question determines the standard of review we must apply. If the terms of the grant are clear with respect to this issue, its meaning is a question of law and we simply apply the plain meaning of the grant without reference to the trial court's interpretation of the instrument. If, however, the language is ambiguous, the meaning of the

agreement is a question of fact to be determined by the trier of fact. *Piskorowski v. Shell Oil Co.* (1980), Ind.App., 403 N.E.2d 838, 844.

■■■ The primary standard we apply to determine whether the contract is ambiguous on its face is whether reasonable men would find its terms susceptible to more than one interpretation. 403 N.E.2d at 844. Two additional principles guide us in this determination: words are to be given their usual and common meaning unless, from the entire contract and subject matter thereof, it is clear that some other meaning is intended, and particular words and phrases of a contract cannot be read alone, the parties' intention must be gathered from the entire contract. 403 N.E.2d at 845. The trial court found that:

> The "damage deposit" requirement sought to be imposed by Piser in his individual capacity and as general partner is arbitrary and is intended to significantly discourage the use of the pool and clubhouse facilities by the tenants of Fox Run apartments.

We must determine whether the grant on its face prohibits Tomahawk from conditioning the use of the pool facilities upon the payment of a damage deposit which is intended to discourage the use of the facilities by Fox Run tenants.

Our first step is to examine the following language which Tomahawk cites in support of its action: "the rules and regulations set by the owners of the respective premises shall govern the use and enjoyment of those facilities." The security requirement is clearly a rule or regulation. However, the question is what types of rules and regulations may be established. The term "rules and regulations" is modified by "governing the use and enjoyment of those facilities." The American Heritage Dictionary of the English Language (1981) defines the verb "to govern" as "[t]o control the actions or behavior of; guide; direct.... To keep under control; restrain.... To decide; determine." That source includes the following in its definition of the noun "use": "the condition or fact of being used ... The manner of using."

Arguably, the requirement of a security deposit, even if intended to discourage use of the pool facilities, is a rule which determines the fact of the pool being used. However, *Piskorowski* requires us to read the above language in the context of the entire grant. That instrument grants an easement and the right to use Tomahawk's pool facilities to the owners of Fox Run and their tenants. It would be incongruous to read the language regarding rules and regulations to mean that Tomahawk could establish a rule intended to discourage the use, by Fox Run tenants, of the very facilities which the earlier language gives them a right to use equal to that of Tomahawk tenants.

■ The requirement of a security deposit as a precondition to pool use intended to discourage pool use clearly is not allowed by the terms of the grant. Tomahawk argues that the reason for the damage deposit was to enforce its existing reasonable rules prohibiting users from damaging the facilities. It points to the necessity for the rule in order to more easily hold tenants responsible for the damage they inflict. The trial court, however, did not so find. The question that remains is whether the court's finding that the security requirement was intended to discourage pool use is erroneous. Our standard of review where the trial court has filed special findings pursuant to Trial Rule 52 is that we will not reverse unless the court's findings are "clearly erroneous." *Steenhoven v. College Life Ins. Co. of America* (1984), Ind.App., 458 N.E.2d 661, 665, *reh'g denied, Steenhoven v. College Life Ins. Co. of America* (1984), Ind.App., 460 N.E.2d 973. Such findings are not clearly erroneous if they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and are supported by evidence of probative value in the record. *Id.*

■ The court's finding is supported by probative evidence. Farren testified that when Piser originally broached the security deposit requirement he also offered to sell

Tomahawk Village to Farren for $30,000 per unit. When Farren responded that he had bought Fox Run for $12,000 per unit, Piser said that, if he paid the thirty thousand per unit for Tomahawk Village, he would still have bought the combined properties for a reasonable price. In addition, Farren testified that Tomahawk Village was Fox Run's closest competitor in the Indianapolis market and that denial of pool access or the charging of a separate security deposit for pool usage would be detrimental to Fox Run in the leasing market. At that time, some Fox Run leases only required a $99 security deposit. The security requirement would have put Farren in the position of either charging additional security from his tenants or coming up with a substantial amount of money from his own pocket. It would have also required Farren to charge additional security to future tenants.

We also find probative the fact that, despite the existence of extreme temperatures, Tomahawk denied Fox Run tenants access to the pool when Farren refused to agree to a security deposit requirement instead of continuing negotiations. In addition, Piser testified that he thought the grant agreement was a bad deal for Tomahawk because it had to share maintenance and repair costs equally, but only had 200 units as compared to 260 in Fox Run. We find that the court's conclusion that the security requirement was intended to significantly discourage use of the facilities was not clearly erroneous.

Tomahawk next claims that the trial court erred in granting a permanent injunction because of Farren's refusal to pay his share of maintenance and repair costs. Tomahawk essentially bases its allegation of error upon two separate legal theories. The first is that Farren could not seek to have the agreement enforced because his failure to pay maintenance and repair costs constituted a breach and relieved Tomahawk of any duty to perform its obligations under the agreement. The second is that a party must have "clean hands" to seek equitable relief, and because Farren refused to pay certain costs, the legitimacy of which he did not dispute, he did not have

clean hands. The factual basis for both arguments is essentially the same.

■ There is a threshold question of whether Tomahawk has waived the issue due to its failure to take an interlocutory appeal following the denial of its motion to vacate the preliminary injunction. Farren contends that the issue of unclean hands was raised in that motion and therefore available in an interlocutory appeal. We hold that Tomahawk has not waived this issue. The only issues waived by failure to take an interlocutory appeal from the grant or denial of a preliminary injunction are those going to the propriety of the grant or denial of the *preliminary* injunction. Thus, a party waives the right to appeal the trial court's failure to issue special findings required by T.R. 52 in preliminary injunction hearings when it does not take an interlocutory appeal. *Neel v. I.U. Board of Trustees* (1982), Ind.App., 435 N.E.2d 607, 613. Furthermore, a preliminary injunction merges into the permanent injunction when one is issued and any error in the preliminary injunction becomes harmless. *Detamore v. Roberts* (1944), 223 Ind. 12, 14, 57 N.E.2d 585, 586; *Becknell v. Becknell* (1887), 110 Ind. 42, 54, 10 N.E. 414, 420.

■ Tomahawk has not waived the right to appeal the propriety of the permanent injunction. We find no Indiana cases holding that a party waives alleged errors in the issuance of a permanent injunction by failing to take an interlocutory appeal from the grant of a preliminary injunction. A preliminary injunction is a remedy that is generally used to preserve the status quo as it existed prior to a controversy pending a full determination on the merits of that controversy. *Rees v. Panhandle Eastern Pipe Line Co.* (1978), 176 Ind.App. 597, 604–605, 377 N.E.2d 640, 646. In order to make out a successful case for a preliminary injunction, a plaintiff need only show a prima facie case on the merits. *Indiana Annual Conference Corporation v. Lemon* (1956), 235 Ind. 163, 167, 131 N.E.2d 780, 782. The hearing for permanent injunction allows the parties to adjudicate the facts of the controversy in much greater detail. A trial court may grant a prelimi-

nary injunction and, upon further consideration, dissolve it and refuse to issue a permanent injunction. We therefore find that Tomahawk did not waive its argument that Farren's refusal to pay certain invoices prevented him from seeking an injunction by not filing an interlocutory appeal of the preliminary injunction.

■ With respect to the merits of Tomahawk's argument, we first address the claim that Tomahawk was relieved of its obligation to allow Fox Run tenants to use its facilities due to Farren's failure to pay his share of maintenance and repair costs. The court in *Licocci v. Cardinal Associates Inc.* (1986), Ind.App., 492 N.E.2d 48, *trans. denied* held that "[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Id.* at 52.

■ The question of whether a party has materially breached an agreement is a question of fact and is dependent upon several factors including:

"(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The willful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract."

*Churchwell v. Coller and Stoner Bldg. Co.* (1979), 179 Ind.App. 357, 361–362, 385 N.E.2d 492, 495. In the present case, the court found that "the defendants ... failed to establish by a preponderance of the evidence a valid renunciation of [sic] breach other than plaintiff's refusal to pay disputed claims for funds alleged to be due." (Record, 125). We take this finding to mean that Tomahawk failed to demonstrate, as it alleged in its counter claim, that Farren materially breached the grant prior to its refusal of access to his tenants. The standard of review which we must apply to this factual finding is the clearly erroneous standard described above. *Steenhoven*, 458 N.E.2d at 665.

Tomahawk claims that Farren had, in effect, renounced the contract by his failure to pay amounts which he did not dispute prior to the denial of access to the pool facilities. However, the court's factual finding that there was not a valid renunciation is supported by probative evidence in the record. Tomahawk denied Fox Run tenants access to the pool facilities less than one month after Farren obtained ownership of Fox Run. Both Farren and Debbie Bell, his property manager at the time, testified that they disputed the legitimacy of some of the bills they received from Tomahawk. Such testimony supports the inference that Farren had not materially breached the grant before Tomahawk breached the agreement by denying Fox Run tenants access to the pool.

■ Tomahawk also contends that Farren continued to breach the agreement by failing to pay even the undisputed amounts due for maintenance and repair following the grant of a preliminary injunction requiring it to allow Farren access to the pool. Again, there is ample evidence to support a finding that Farren did not materially breach the agreement. The court admitted a June 30, 1988 letter from Farren's attorney to Piser's attorney in which a $1000 check was enclosed to show his "good faith" and to be applied with respect to Farren's share of the expenses. The letter listed additional charges which it disputed and asked to discuss the legitimacy of those charges and to be provided with supporting documentation. In addition, Ms. Brown, the property manager for Fox Run from April, 1989, through the course of the litigation, testified as to 1988 invoices she disputed. She also testified that when she tried to contact Mrs. Miller and Sue Amonett, she could not get them to talk about any problems regarding the

pool. In addition, the litigation involved questions of whether Farren was entitled to set-off for expenses incurred to maintain and repair the basketball and tennis courts, as well as whether Fox Run tenants were wrongfully excluded from the pool during the time it was shut down for repairs.

The evidence supports the following inferences regarding whether Farren materially breached the agreement. Tomahawk would obtain the substantial benefit which it could have reasonably anticipated, i.e. Farren's proper share of the maintenance and repair costs, once the disputed charges were supported with documentation. Following the hearing which became necessary because of the significant dispute as to the legitimacy of several billings, Tomahawk would be fully compensated in damages for lack of complete performance. The hardship to Farren stemming from termination would be greater than the hardship to Tomahawk from the nonpayment of amounts eventually determined to be improperly withheld, especially in light of the fact that Tomahawk still would have incurred most of the expenses if it had operated the pool solely for the benefit of its own tenants. Farren's behavior in failing to pay his share of costs was not willful or negligent, as demonstrated by the tender of $1000 until the disputes could be settled as well as the problems he experienced with documentation and communication. Finally, because there was evidence that Farren's failure to pay centered upon disputes as to the correctness of charges and billing methods, there was little uncertainty that he would fail to perform in the future. These inferences support the court's findings which in turn support the court's judgment.

▪ Tomahawk's argument regarding the "tender" of $1000 dollars is misplaced. It is correct in its assertion that the $1000 check was not sufficient to discharge Farren's duties under the agreement. *Cole Associates v. Holsman* (1979), 181 Ind.App. 431, 391 N.E.2d 1196 holds that a tender does not discharge a party's liabilities unless it is for the full amount due. 181 Ind.App. at 435–436, 391 N.E.2d at 1198–1199. Furthermore, if a tender is refused

it can only be kept open by paying the full amount due into court to be available to the party to whom the amount was tendered. *Id.* However, Farren did not tender the check as payment in full, but rather as a gesture of his "good faith" and as working capital for Tomahawk to be applied against expenses until his questions regarding the charges were answered. Thus the letter and check serve as evidence of Farren's good faith and support the inference that he would pay in full when his liabilities were finally determined.

▪ Likewise, Tomahawk's contention that the court erred in granting the permanent injunction because Farren had unclean hands is not meritorious. For the unclean hands maxim to apply, the party so charged must be guilty of intentional misconduct. The doctrine is applied with reluctance and scrutiny. *IHSAA v. Raike* (1975), 164 Ind.App. 169, 198, 329 N.E.2d 66, 84. Here the trial court made no finding regarding unclean hands, but in in a case such as this, where the parties did not request special findings and they are not otherwise required under T.R. 52, the judgment controls and we must affirm if it is sustainable upon any theory. *Mishawaka Brass Mfg., Inc. v. Milwaukee Valve Co., Inc.* (1983), Ind.App., 444 N.E.2d 855, 857. The facts discussed in connection with our analysis of material breach support a conclusion that Farren did not engage in intentional misconduct in such a way to render the doctrine of "unclean hands" applicable.

▪ The next allegation of error by Tomahawk is that the court acted inequitably by not issuing an injunction requiring Farren to pay his share of the maintenance and repair costs. Tomahawk has waived this issue due to its failure to request such relief from the trial court. On appeal, a party may not request relief for which he made no claim to the trial court. *See, Vandalia Railroad Co. v. Mizer* (1916), 184 Ind. 680, 686, 112 N.E. 522, 524. It is also true that "an injunction will not ordinarily be granted under a prayer for general relief; but it must be expressly prayed." *Lefforge v. West* (1851) 2 Ind. 514, 515. Tomahawk did not request an injunction from the trial court. It asserts that it

raised the issue of unclean hands in its answer and its motion to vacate preliminary injunction. In neither of these pleadings did it pray for an injunction. In addition, it did not request an injunction in its counter claim, but instead prayed that the easements be terminated and for "all other just and proper relief."

 Finally, Tomahawk claims that the damages awarded on its claim were inadequate. It admits that this is an appeal from a negative judgment but argues that it has satisfied the stringent requirements for reversal. It claims to be entitled to $2600 in "management fees" for the periods of January 1989 through October 1989 and May 20 1988 through December 21, 1988. Tomahawk claims the court erred when it found that Tomahawk was not entitled to a "management fee" under the terms of the grant and denied to it the $2600.

Our standard of review where a party asserts that the damages awarded under breach of contract are inadequate is that we will not reverse if the award is within the scope of the evidence before the trial court. *Indiana University v. Indiana Bonding & Surety Co.* (1981), Ind.App., 416 N.E.2d 1275, 1288. In making this determination we will not reweigh the evidence nor judge the credibility of witnesses. *Id.*

Farren is correct in his view that the agreement, on its face, clearly does not authorize Tomahawk to charge a fixed "management fee." However, Tomahawk argues that the management fee represents an average of actual costs and points to the testimony of Tomahawk's property manager, Sue Amonett, that she arrived at the figure through averaging the time spent on various activities over a five year period. This testimony highlights that neither Farren nor his property manager dis-

puted that the majority of the activities included in the calculation were normal expenses of operating a clubhouse and pool. Tomahawk asserts that, because this testimony is uncontroverted, it has satisfied the stringent requirements of the standard of review. However, the fact that Farren did not present any evidence contradicting the existence of these actual costs does not mean that Mrs. Amonett's testimony necessarily leads to the conclusion that Tomahawk incurred $5200 in actual expenses. The burden was on Tomahawk to prove its damages under its counter claim. The testimony was that the claimed amount represented a monthly average over the course of five years. Tomahawk made no attempt to document the existence of these expenses during the periods in question. Farren correctly points out that, if Tomahawk can document these expenses, the judgment does not preclude them from billing Farren for each actual expense. We find that the award was within the scope of the evidence.

For the foregoing reasons, we affirm. AFFIRMED.

CONOVER and BAKER, JJ., concur.