

FILED

Apr 23 2020, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Craig R. Patterson
Mark E. Bloom
Beckman Lawson, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Robert W. Eherenman
Charles J. Heiny
Haller & Colvin, P.C.
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Wayne Doug Zollinger, <br> *Appellant-Defendant,* <br><br> v. <br><br> Wagner-Meinert Engineering, LLC, <br> *Appellee-Plaintiff* | April 23, 2020 <br><br> Court of Appeals Case No. 19A-PL-1501 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Stanley Levine, Judge <br><br> The Honorable Jennifer L. DeGroote, Judge <br><br> Trial Court Cause No. 02D03-1803-PL-77 |

**Vaidik, Judge.**

## Case Summary

[1]     Wagner-Meinert Engineering, LLC, filed suit against its former employee,

Wayne Doug Zollinger, based on covenants not to compete Zollinger had

agreed to. The trial court entered various rulings in favor of the company, first on summary judgment and then after a bench trial. Zollinger now appeals. We affirm in all respects and remand for an award of appellate attorney's fees to Wagner-Meinert Engineering, LLC.

# Facts and Procedural History

[2] This case arises from Zollinger's history with a Fort Wayne-based mechanical-contracting business that has been operated by various "Wagner-Meinert" entities. In 1996, Zollinger became an employee of Wagner-Meinert Inc. He eventually became a vice president and part-owner of that corporation. Several things changed in September 2011. A newly formed limited-liability company called Wagner-Meinert, LLC, bought the assets and business of Wagner-Meinert Inc.; Zollinger's pro-rata portion of the sale proceeds (based on his 12% interest in the corporation) "exceeded $1.8 million[.]" Appellant's App. Vol. II p. 187.[1] At the same time, Zollinger became Vice President of Operations of another newly formed limited-liability company—the plaintiff in this case, Wagner-Meinert Engineering, LLC ("WME")—at a salary of approximately $242,000 per year. He also paid $324,000 to acquire a 3.6% interest in WME.

[3] Zollinger signed three agreements as part of these deals: an Asset Purchase Agreement governing the sale of Wagner-Meinert Inc. to Wagner-Meinert,

---

[1] The trial court found that Zollinger received "approximately $2,000,000.00." Appellant's App. Vol. II p. 54. WME uses the $1.8 million figure, with no dispute from Zollinger, so we will do the same.

LLC; an Operating Agreement as a condition of ownership of WME; and an Employment Agreement as a condition of employment with WME. All three agreements included non-competition and non-solicitation provisions. The provisions at issue here are those in the Operating Agreement and in the Employment Agreement.

[4] Section 14.02 of the Operating Agreement, entitled "Non-Solicitation/Non-Competition," begins:

> Members acknowledge that it is necessary and appropriate for the Company to protect its legitimate business interests by restricting the Member's ability to solicit business in competition with the Company and that any violation of the covenants would result in irreparable injury to the Company's legitimate business interests. The Members agree that the following non-solicitation/non-competition covenants are drafted narrowly to safeguard the Company's legitimate business interests.
>
> The Members agree that during the time a Member is employed by the Company and for a period of forty-two (42) months after the termination of a Member's employment relationship with the Company, the departing Member shall not engage in the following activity unless advance, express written permission has been granted by an authorized officer of the Company:

Appellant's App. Vol. III p. 57. That introductory language is followed by fourteen specific restrictions—subsections (a) through (n). Most relevant here are subsections (a) and (b). Subsection (a) provides that members cannot "have any ownership interest in, work for, advise, or have any business connection or business relationship with any person or entity that competes with" WME. *Id.*

at 58. Subsection (b) provides that members cannot "perform, in any capacity, activity related to management, product development, product processes and techniques, recruiting, sales or administration for any firm or business which is engaged in similar businesses as" WME "in the geographic area served by" WME. *Id.*

[5] Similarly, Section 7(a) of the Employment Agreement provides that Zollinger cannot compete with WME for two years following the termination of his employment. *Id.* at 19. "Compete" is defined as "to engage or seek to engage in activities the same as or substantially similar to the duties performed by [Zollinger] for [WME] during the 24 months preceding the termination of [Zollinger's] employment . . . for a person or entity engaged in a business substantially similar to the business of [WME]." *Id.* The restriction is limited to "the same geographic area" Zollinger worked in during his last two years with WME. *Id.*

[6] In April 2015, the majority member of WME—Ambassador WME, LLC— bought out the other members, including Zollinger. Zollinger received $1,316,844 for his 3.6% interest, almost $1,000,000 more than his initial contribution of $324,000. However, Zollinger and the other selling members continued as employees of WME pursuant to Section 8 of the Purchase and Sale Agreement, which provides that the sellers "desire to continue their employment with the Company," that "employment shall continue pursuant to the written Employment Agreements with Addenda dated September 8, 2011," and that "all rights, duties and obligations of each Seller and the Company

under such employment agreements shall survive this Agreement and continue as provided in said employment agreements." *Id.* at 72. Zollinger also remained a member of WME's Board of Managers. The Purchase and Sale Agreement includes an integration clause that provides, in part, "This Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, agreements and understandings, oral and written, among or between any of the parties hereto with respect to the subject matter hereof." *Id.* at 73.

[7] On January 28, 2018, WME terminated Zollinger's employment for submitting false expense reports. Three weeks later, WME sent Zollinger a letter reminding him of the restrictions contained in the Operating Agreement and the Employment Agreement. Zollinger wrote back, acknowledging the restrictions in the Employment Agreement but asserting that his obligations under the Operating Agreement ended when Ambassador WME, LLC, bought his ownership interest in WME. He also indicated his intent to continue working in WME's "industry," but without violating the Employment Agreement:

> To be honest, I need to work for 3 or 5 more years and, unless I work within our industry, I won't be paid anywhere near what I was paid at Wagner Meinert. As a result, I now have an offer of employment in our industry I am considering. I have shown that company my Employment Agreement and have told them I will comply with the restrictive covenants in it. Candidly, that company expects no less of me.

Appellant's App. Vol. II p. 162. WME then asked Zollinger to provide the details of his new/prospective employment. Zollinger responded, "At this time I have several offers and have not made a decision. My conversations have all been around mentoring leadership. There is no anticipated conversation with any customers." *Id.* at 171.

[8] Ten days after receiving that response, WME filed a declaratory-judgment action against Zollinger. WME asked the trial court to declare, among other things, that the restrictions in both the Operating Agreement and the Employment Agreement are applicable and enforceable. WME moved for summary judgment. On November 14, 2018, the trial court issued an order granting WME's motion. The court concluded that the restrictions in the Operating Agreement were not extinguished when Zollinger sold his interest in WME and that the restrictions in the Operating Agreement and the Employment Agreement are reasonable and enforceable. It also ordered Zollinger to comply with the restrictions.

[9] A few weeks after the trial court issued its summary-judgment order, WME amended its complaint to add a claim of breach of contract. Whereas the original complaint alleged that Zollinger was **about to violate** the restrictions, the amended complaint alleged that he **had violated** the restrictions. Specifically, WME claimed that from July to November of 2018, Zollinger did consulting work for Freije-RSC Engineered Solutions Company ("Freije"), a Fishers-based competitor of WME. The trial court held a bench trial on April 11, 2019, and issued its findings of fact and conclusions of law in June 2019.

The court concluded that Zollinger's work for Freije violated the Operating Agreement and the Employment Agreement. It did not award WME any damages, but it entered an injunction requiring Zollinger to comply with the restrictions and ordered Zollinger to pay WME $38,657.23 in attorney's fees and expenses.

Zollinger now appeals.

# Discussion and Decision

Zollinger challenges several of the trial court's rulings, both on summary judgment and after the bench trial. WME asks us to affirm the trial court in all respects and argues that it is entitled to an award of appellate attorney's fees.[2]

## I. Summary-Judgment Issues

Zollinger contends that the trial court erred by granting summary judgment to WME on the original complaint. We review motions for summary judgment de novo, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). That is, "The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no

[2] Indiana Appellate Rule 46 provides that every contention in the argument section of a brief "must be supported by citations to . . . the Appendix or parts of the Record on Appeal relied on[.]" The 28-page argument section of Zollinger's opening brief does not include a single citation to the record, and the 44-page argument section of WME's brief includes only a handful. Needless to say, this lack of citations significantly hindered our review.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

## A. Integration Clause

Zollinger first argues that the restrictions in Section 14.02 of the Operating Agreement were eliminated by virtue of the integration clause in the 2015 Purchase and Sale Agreement relating to Ambassador WME, LLC's buyout of the other members of WME. Again, the integration clause provides, in part, "This Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, agreements and understandings, oral and written, among or between any of the parties hereto with respect to the subject matter hereof." Zollinger asserts that the "subject matter" of the Purchase and Sale Agreement includes not only the sale of shares of WME to Ambassador WME, LLC, but also his "rights, duties and obligations to WME following the sale." Appellant's Br. p. 32. He bases this argument on the fact that Section 8 of the Purchase and Sale Agreement provides that the employment of the selling members "shall continue pursuant to the written Employment Agreements with Addenda dated September 8, 2011," and that "all rights, duties and obligations of each Seller and the Company under such employment agreements shall survive this Agreement and continue as provided in said employment agreements." Zollinger contends that the "plain meaning" of this provision "is that following the sale of Zollinger's shares, all rights, duties, and obligations of Zollinger and WME were to be in accordance with Zollinger's Employment Agreement." *Id.* at 33. In other words, while Zollinger

acknowledges that the competition restrictions in his Employment Agreement survived the integration clause, he argues that the restrictions in the Operating Agreement did not. The trial court rejected this argument, and so do we.

[14] Section 8 of the Purchase and Sale Agreement does not purport to establish **all** "rights, duties, and obligations of Zollinger and WME" going forward. It addresses only "all rights, duties and obligations of each Seller and the Company **under such employment agreements**[.]" (Emphasis added). As the trial court explained—in findings not challenged by Zollinger—"Zollinger's obligations under the Employment Agreement were independent of his obligations under the Operating Agreement, and he received independent consideration for each of the agreements" (under the Employment Agreement, a yearly salary over $240,000, and under the Operating Agreement, "the benefits of ownership in WME, which ultimately resulted in a $1 million profit"). Appellant's App. Vol. II p. 38. While the Purchase and Sale Agreement addresses Zollinger's obligations under his Employment Agreement, it says nothing at all about his independent obligations under Section 14.02 of the Operating Agreement. As such, the latter obligations are not part of the "subject matter" of the Purchase and Sale Agreement, and the trial court properly concluded that those obligations survived the integration clause.

# B. Reasonableness

[15] Next, Zollinger contends that even if the restrictions in the Operating Agreement were not eliminated by the integration clause, those restrictions and the restrictions in the Employment Agreement are overbroad and therefore unenforceable. Covenants not to compete are enforceable if they are reasonable. *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005). However, the manner in which reasonableness is determined depends on the context in which the covenant was established. *Id.* Covenants in typical employment contracts are reviewed under a "skeptical" standard, while covenants that arise ancillary to the sale of a business are subject to a more liberal standard. *Id.*

[16] Here, the trial court determined that the restrictions in the Operating Agreement and the Employment Agreement arose ancillary to Zollinger's sale of his interest in Wagner-Meinert Inc., and, applying the more liberal standard, found all the restrictions to be reasonable and enforceable. Zollinger argues that the trial court erred in applying the more liberal standard, and his reasonableness argument follows from that premise. That is, Zollinger's contentions about reasonableness all assume the applicability of the "strict" employment standard, rather than the more liberal sale-of-a-business standard. *See* Appellant's Br. p. 36 ("Applying the strict standard, the restrictions in Section 14.02 [of the Operating Agreement] are unreasonable as to time, geographic restriction, and the activity to be restricted."); *id.* at 51 (citing *Brunner v. Hand Industries, Inc.*, 603 N.E.2d 157 (Ind. Ct. App. 1992), a case

applying the employment standard, in arguing that the activity restriction in the Employment Agreement is unreasonable because it "would prevent Zollinger from utilizing his general skills and knowledge"); Appellant's Reply Br. p. 23 ("Under the strict standard, Zollinger's activity restriction [under the Employment Agreement] is overbroad because it prohibits him from performing any activity for a competitor regardless of whether the activity is competitive or protects a legitimate business interest."). Zollinger does not argue in the alternative that the restrictions are unreasonable even under the more liberal sale-of-a-business standard. Therefore, if we agree with the trial court that the more liberal standard applies, Zollinger's arguments about reasonableness will necessarily fail.

[17] The parties' arguments about the proper standard to be applied center on our Supreme Court's decision in *Dicen*. There, Dicen and two other people owned an environmental-consulting business called Sesco. Dicen managed one of Sesco's divisions and was involved in marketing, bidding, and training. A group of investors incorporated New Sesco, Inc., to purchase the assets of Sesco. In exchange for approximately $300,000, Dicen signed a purchase agreement that included a non-solicitation covenant. The same day, he signed an employment agreement that included a covenant not to compete. Dicen later left New Sesco and started a competing business. New Sesco sued and won an injunction against Dicen.

[18] On appeal, Dicen argued that the covenants in the purchase and employment agreement were overbroad and unenforceable. Our Supreme Court

distinguished between covenants entered into "ancillary to the sale of a business" and covenants "arising out of an employer-employee relationship," explaining that the former are to be reviewed "on a more liberal basis than the skeptical one courts use regarding contracts between employer and employee." *Dicen*, 839 N.E.2d at 685, 687.  The Court cited the rationale stated by a Massachusetts court:

> In the former situation there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer.  Where the sale of the business includes good will . . . a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased . . . .  On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer.

*Id.* at 687 (quoting *Alexander & Alexander, Inc. v. Donahy*, 488 N.E.2d 22, 28 (Mass. App. Ct. 1986)).

[19] Applying this "more favorable review," the Court approved the non-solicitation covenant in the purchase agreement.  *Id.* at 688.  More importantly for our purposes, however, the Court found that the covenant not to compete in the **employment agreement** was also subject to the more liberal review.  The Court explained, "Since this employment covenant not to compete was executed in the same business transaction as the sale of a business covenant, and therefore

the bargaining power was likely equal here as well, we will also engage in a more liberal review of its reasonableness." *Id.* at 689.

[20] Regarding the restrictions in the Operating Agreement, Zollinger argues that those restrictions were not "ancillary" to his sale of his interest in Wagner-Meinert Inc., because he agreed to those restrictions as a condition of **purchasing** an interest in WME, not as a condition of **selling** his interest in Wagner-Meinert Inc. That argument is foreclosed by *Dicen*. Again, in *Dicen*, our Supreme Court held that the covenant not to compete in the employment agreement was subject to the more liberal review because Dicen's execution of that covenant was part of "the same business transaction" as his sale of his interest in Sesco. Likewise, here, Zollinger's execution of the Operating Agreement was part of "the same business transaction" as his sale of his interest in Wagner-Meinert Inc. As the trial court found, "the Operating Agreement was entered into at the same time as the documents related to the sale of Wagner-Meinert, Inc. and was otherwise related to the sale of Wagner-Meinert, Inc." Appellant's App. Vol. II p. 40.

[21] Zollinger's execution of the Employment Agreement was also part of the same business transaction as his sale of his interest in Wagner-Meinert Inc. Nonetheless, Zollinger argues that this case is distinguishable from *Dicen*. He contends that our Supreme Court's premise regarding the employment covenant in *Dicen*—that "the bargaining power was likely equal" with respect to the employment covenant because it was executed in the same business transaction as the sale of a business—does not apply here. Zollinger asserts that

he lacked bargaining power with regard to his Employment Agreement because the Asset Purchase Agreement governing the sale of Wagner-Meinert Inc. included its own five-year non-compete clause, so "if he wanted to work following the sale, he was required to sign the Employment Agreement." Appellant's Br. p. 47. He says he "was compelled to work for WME." Appellant's Reply Br. p. 15.

[22] For several reasons, we reject Zollinger's claim that he lacked bargaining power with respect to the Employment Agreement. He does not dispute the trial court's finding that he is a "sophisticated businessman." Appellant's App. Vol. II p. 44. Nor does he dispute the trial court's finding that there were "extensive negotiations" surrounding the execution of the September 2011 agreements. *Id.* In addition, Zollinger was paid in excess of $1.8 million for his interest in Wagner-Meinert Inc.—at least $600,000 more than the $1.2 million in salary he went on to earn in the five years after entering into the Employment Agreement (approximately $242,000 per year). As noted in *Dicen*, such proceeds "generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business[.]" 839 N.E.2d at 687. And by 2011, Zollinger had been with the company for twenty-five years, both as an employee and an executive. His experience and institutional knowledge alone gave him significant bargaining power.

[23] Because the Employment Agreement was part of the same business transaction as Zollinger's sale of his interest in Wagner-Meinert Inc., and because Zollinger had substantial bargaining power, the trial court properly concluded that the

restrictions in the Employment Agreement should be reviewed under the more liberal sale-of-a-business standard. And that conclusion is fatal to Zollinger's arguments about the reasonableness of those restrictions, all of which he makes under the strict employment standard.

We affirm the trial court's grant of summary judgment to WME.

# II. Trial Issues

Zollinger also contends that even if the trial court properly concluded on summary judgment that the restrictions in the Operating Agreement and the Employment Agreement are enforceable, it erred by concluding after trial that his work for Freije violated the restrictions. He also challenges the trial court's issuance of an injunction and its award of attorney's fees and expenses to WME. We will set aside a trial court's findings and conclusions only if they are clearly erroneous. *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015). We will not reweigh the evidence or reassess witness credibility. *Id.* "Instead, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them." *Id.*

## A. Breach

Zollinger asserts that the trial court erred by concluding that his work for Freije between July and November of 2018 violated the Operating Agreement and the Employment Agreement. He does not dispute the trial court's finding that "Freije and WME are competitors." Appellant's App. Vol. II p. 64. Instead, he argues that there is no evidence that he shared anything "proprietary,"

"confidential," "unique," or "secret" to WME with Freije. Appellant's Br. pp. 41-46.

[27] The problem with Zollinger's argument is that none of the restrictions he was found to have violated is limited to "proprietary," "confidential," "unique," or "secret" information. The trial court found that Zollinger violated Section 14.02(a) and (b) of the Operating Agreement and Section 7(a) of the Employment Agreement. Section 14.02(a) of the Operating Agreement provides that Zollinger cannot "have any ownership interest in, work for, advise, or have any business connection or business relationship with any person or entity that competes with" WME. Section 14.02(b) of the Operating Agreement provides that Zollinger cannot "perform, in any capacity, activity related to management, product development, product processes and techniques, recruiting, sales or administration for any firm or business which is engaged in similar businesses as" WME. And Section 7(a) of the Employment Agreement provides that Zollinger cannot "engage or seek to engage in activities the same as or substantially similar to the duties performed by [Zollinger] for [WME] during the 24 months preceding the termination of [Zollinger's] employment . . . for a person or entity engaged in a business substantially similar to the business of [WME]."

[28] The trial court's conclusion that Zollinger violated these restrictions is supported by numerous findings of fact, none of which Zollinger challenges on appeal. We quote these findings at length because they make clear the

similarities between WME's business and Freije's business and the overlap of the work Zollinger performed for the two companies:

> 12. WME is a mechanical contractor providing services which include plumbing, piping, HVAC, and industrial refrigeration.

*     *     *     *

> 14. Zollinger's duties at WME included updating the sell rate factors in estimating workbooks based upon market conditions; creating career paths for service technicians to become service group leaders; recruiting of service technicians and group leaders; identifying mergers and targets for mergers; assisting remote locations with developing annual budgets; helping to secure additional space for a fab shop in Fort Worth; helping evaluate and acquire equipment for the Fort Worth fab shop; evaluating the work of welders in Fort Worth; assisting with the purchase of additional equipment for the compressor shop, coach and mentor leaders at remote locations; mentors those who would be taking over his position upon retirement; and participating in and representing WME with activities associated with the Mechanical Contractor[s] Association.

> 15. WME maintains fabrication ("fab") shops in Fort Wayne, Fort Worth, and at Kelly Refrigeration.

> 16. A fab shop is a light manufacturing facility where raw materials and equipment can be used in a contained environment to produce products, including things like skid packages. Having a fab shop allows a contractor to perform all the work on the skid package in a controlled environment and with more tools than would be available in the field. Once completed, the skid

package is loaded on a trailer taken to a job site, where final piping and connections are done.

17. Having a fab shop is a competitive advantage in the industry as it [is] more efficient and cost effective to fabricate components in a fab shop than on-site.

18. Having a fab shop is not unusual. In Indiana, there are five ammonia refrigeration contractors. Of those five (5) contractors, three (3) have fab shops.

19. Most mechanical contractors have fab shops.

20. Freije is a mechanical and industrial refrigeration service contractor with its headquarters in Fishers, Indiana.

21. Freije does not have a fab shop, but has been considering building one for approximately ten (10) years.

22. Freije's delay in building a fab shop is attributed to Freije not having the critical mass of business needed to keep the fab shop busy.

23. Freije and WME are competitors.

*      *      *      *

29. While consulting for Freije, Zollinger interviewed project managers, superintendents, and estimators regarding their jobs, job descriptions and the communications among those three positions.

30. Zollinger reviewed the points of contact a customer goes through to interact with Freije.

31. Zollinger provided Freije with an overview of the steps to start up a fab shop.

32. Over his career, Zollinger has laid out four (4) fab shops to substantial completion and consulted on another.

33. Zollinger also provided a handwritten sketch of a fab shop layout to Rick Aston ("Aston"), a Freije CAD designer, who utilized the sketch to create a computer aided drawing of a fab shop.

34. The similarities between the layout of WME's fab shop and Aston's CAD drawing include work flow and the same or similar location of the overhead doors, racking, office, restroom, breakroom, valves and fittings, and tool room.

35. Zollinger assisted Freije with the potential sale of a division of Freije. He was the point of contact for those interested in buying the division and reached out to two (2) companies that he thought might be interested in buying the division.

36. Zollinger assisted Freije in developing career paths outlining how an employee can progress by developing skills and becoming competent in areas. Career paths were developed for field personnel, service technicians, and project managers.

37. Zollinger created job descriptions for Freije's project managers, superintendents, and estimators to help prevent redundancies.

38.    Over the course of Zollinger's consulting work for Freije, Zollinger reviewed approximately five (5) bids to ensure that Freije had included all the necessary costs for materials and labor.

\*     \*     \*     \*

40.    While performing consulting-services for Freije, Zollinger reviewed and recommended equipment for Freije's compressor rebuild shop.  Zollinger recommended purchasing a balancing machine, a parts washer, and a spray cabinet washer for Freije's compressor rebuild shop.

41.    Zollinger was in the early stages of assisting with Freije's mentoring program that it had in place.

42.    Zollinger suggested that Freije consider utilizing an open book for bids as a way to build trust with the customer. WME used open book bids in its work.

43.    Prior to Zollinger providing services to Freije, [Freije President Mike Webster] created a list of areas with which he wanted Zollinger to assist Freije.  One of the areas was to review if there was a more efficient way to manage projects that would allow an increased amount of managed projects/project managers to get a higher return on investment.

44.    Zollinger made recommendations on how to improve Freije's foreman's expectations regarding the project manager's duties.

45.    Zollinger made recommendations on how to improve the superintendent's expectations regarding the project manager's duties.

46. Zollinger made recommendations on how to improve construction field efficiencies.

47. Zollinger made recommendations on how Freije could improve the constructability of designs and how to improve drawing them more efficient in the field.

48. Zollinger made recommendations on how to improve training for forem[e]n, technicians, and project managers.

49. Zollinger made recommendations on how to increase revenue from techs and the margins earned on the techs.

50. Zollinger made recommendations on how Freije could improve its recruiting strategies.

Appellant's App. Vol. II pp. 63-68.

[29] Zollinger takes particular issue with the notion that assisting Freije in the development of a "fab shop" violated the restrictions. He notes that "WME does not treat its fab shop as proprietary," that "WME does not keep its fab shop a secret to those outside its organization," that "[t]he Seven stop process for starting up a fab shop is not confidential or proprietary because similar materials published by the [Mechanical Contractors Association] are readily available for anyone to download," and that "Freije can hire another consultant to build a fab shop." Appellant's Br. pp. 42-43. But the fact that Freije might not have **needed** Zollinger's assistance in building a fab shop does not mean that it did not benefit greatly from his assistance, particularly given the trial court's finding that Zollinger "has laid out four (4) fab shops to substantial

completion and consulted on another." And even if we were to agree with Zollinger that his work on Freije's fab shop did not violate the restrictions, his other work did, including: assisting Freije with the potential sale of one of its divisions and with developing career paths for employees; creating job descriptions for project managers, superintendents, and estimators; reviewing bids; reviewing and recommending equipment for Freije's compressor rebuild shop; assisting with Freije's mentoring program; recommending improvements regarding the duties of project managers, construction-field efficiencies, the constructability of designs, training for foremen, technicians, and project managers, and recruiting strategies; and recommending how to increase revenue and margins from techs. In light of the extensive and important work Zollinger did for Freije, the trial court did not err by concluding that Zollinger violated Section 14.02(a) and (b) of the Operating Agreement and Section 7(a) of the Employment Agreement.[3]

## B. Injunction

Zollinger contends that the trial court erred by including an injunction in its June 2019 order, requiring him to comply with the restrictions in the Operating Agreement and the Employment Agreement. He asserts that injunctive relief is

---

[3] The trial court also found that Zollinger violated Section 14.02(c) of the Operating Agreement, which prohibits him from performing "work of the type" he performed for WME for any customers of WME. Appellant's App. Vol. III p. 58. Zollinger asserts that there is no evidence in the record that he performed any work for WME's current or past customers. WME does not dispute that assertion, so we agree that the trial court erred in this regard. However, Zollinger does not argue that he was prejudiced by this error or propose specific relief. As such, there is no need for remand on this issue.

improper because WME did not explicitly request it in any of its pleadings. He cites our decision in *Tomahawk Village Apartments v. Farren*, where we said that "'an injunction will not ordinarily be granted under a prayer for general relief; but it must be expressly prayed.'" 571 N.E.2d 1286, 1294 (Ind. Ct. App. 1991) (quoting *Lefforge v. West*, 2 Ind. 514, 515 (1851)). For two reasons, we reject Zollinger's argument.

[31] First, whether injunctive relief must be specifically requested in a pleading was not the issue in *Tomahawk Village*. The issue was whether the appellant had waived its argument that the trial court erred by not entering an injunction. In holding that it had, we noted that the appellant did not ask for injunctive relief in its pleadings, but our ultimate holding was that the appellant "waived this issue due to its failure to request such relief from the trial court"—**at all**. 571 N.E.2d at 1294. Here, WME did request injunctive relief (as further discussed below), so our holding in *Tomahawk Village* does not help Zollinger.

[32] Second, even though WME did not expressly request injunctive relief in its pleadings, Zollinger was well aware that such relief was on the table. Injunctive relief is included as a remedy for WME under both the Operating Agreement and the Employment Agreement.[4] The trial court had granted WME injunctive

---

[4] Section 14.03(a) of the Operating Agreement provided, in part, "In the event of any violation of the covenants described in the preceding paragraphs, [WME] shall be authorized and entitled to obtain from any court of competent jurisdiction preliminary and permanent injunctive relief[.]" Appellant's App. Vol. III p. 60. Section 7 of the Employment Agreement provided, in part, "It is agreed that any breach of this Agreement by the Employee shall entitle [WME] to apply to any court of competent jurisdiction to enjoin any violation, threatened or actual, of this Agreement." *Id.* at 20.

relief in its November 2018 summary-judgment order.[5] WME requested injunctive relief in the trial brief it filed three days before trial. Appellee's App. Vol. II p. 18. And WME indicated that it wanted injunctive relief in its opening statement at trial. Tr. p. 59. We agree with WME that "Zollinger had both advance notice and a full and fair opportunity to litigate the propriety of the injunction." Appellee's Br. p. 63.

[33] In addition to his argument about the pleadings, Zollinger contends that the trial court failed to make sufficient findings in support of the injunction. He notes that trial courts are to consider the following four factors in deciding whether to grant permanent injunctive relief: (1) whether the plaintiff's remedies at law are inadequate; (2) whether the plaintiff has succeeded on the merits; (3) whether the threatened injury to the plaintiff outweighs the threatened harm a grant of relief would occasion upon the defendant; and (4) whether the public interest would be disserved by granting relief. *Doe 1 v. Boone Cty. Prosecutor*, 85 N.E.3d 902, 911 (Ind. Ct. App. 2017). He asserts that the trial court erred by failing to make findings as to whether the threatened injury to WME outweighs the threatened harm a grant of relief would occasion upon

---

[5] In his opening brief, Zollinger argued that the trial court erred by granting WME injunctive relief in its summary-judgment order. WME responded that Zollinger waived the issue by failing to pursue an interlocutory appeal as a matter of right under Indiana Appellate Rule 14(A)(5) and that the issue is moot because the summary-judgment injunction "merged into the permanent injunction issued after trial." Appellee's Br. pp. 59-60. Zollinger did not dispute either argument in his reply brief, so we consider the issue abandoned.

him and whether the public interest would be disserved by granting relief. Again, for two reasons, we reject this argument.

[34] First, Zollinger does not cite any authority requiring a trial court to make specific findings when granting permanent injunctive relief. Indiana Trial Rules 52(A)(1) and 65(D) require such findings when a **preliminary** injunction is granted. However, those rules say nothing about **permanent** injunctions. *See Neel v. Ind. Univ. Bd. of Trs.*, 435 N.E.2d 607, 613 (Ind. Ct. App. 1982).

[35] Second, as WME notes, Indiana courts have repeatedly held that injunctive relief is an appropriate remedy for the breach of a restrictive covenant. *See, e.g., Washel v. Bryant*, 770 N.E.2d 902, 907 (Ind. Ct. App. 2002); *Unishops, Inc. v. May's Family Ctrs., Inc.*, 399 N.E.2d 760, 765 (Ind. Ct. App. 1980). Zollinger did not address that caselaw in his reply brief. He merely repeated the conclusory argument he made in his opening brief.

[36] Zollinger has failed to show that the trial court erred by granting injunctive relief.

## C. Attorney's Fees and Expenses

[37] Finally, Zollinger challenges the trial court's award of attorney's fees and expenses to WME. The trial court entered that award pursuant to Section 14.03(c) of the Operating Agreement, which provides, "In the event the Company or its Affiliates bring an action, suit or proceeding based upon an actual or threatened breach of Section 14, the prevailing party shall be entitled

to recover the attorney fees and expenses incurred in prosecuting or defending such action."

[38]     Zollinger's first argument is that Section 14.03(c) is not implicated because the trial court "erred in finding that the restrictive covenants in the Operating Agreement were not superseded by the integration clause, were reasonable as a matter of law, and that Zollinger breached the restrictions." Appellant's Reply Br. p. 29. Because we have rejected those claims of error, this argument fails.

[39]     Zollinger also asserts that the trial court erred by allowing WME to submit a supplemental fee affidavit after trial. At the trial on April 11, 2019, WME presented evidence of the attorney's fees it had incurred through April 2. Its post-trial supplemental affidavit addressed fees incurred between April 3 and April 10, on the day of trial, and in the drafting of proposed findings and conclusions. Zollinger objected to the affidavit, stating, "To allow WME to now submit additional evidence regarding attorney fees would be prejudicial to Zollinger, as he has no ability to cross-examine WME regarding its attorney fees." Appellee's App. Vol. II p. 22. He did not cite any authority supporting his position. He renews the argument on appeal, but he again fails to cite any authority, so the argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a) (providing that "[e]ach contention must be supported by citations to the authorities" relied on). Waiver notwithstanding, Zollinger's argument is without merit. When he objected to the supplemental affidavit, he did not tell the trial court what part(s) of the affidavit concerned him or what his cross-examination would have entailed. Moreover, he did not ask the court to set a

hearing so that he could conduct such cross-examination. The trial court cannot be faulted for allowing the affidavit over Zollinger's conclusory objection.

[40] For these reasons, we affirm the trial court's award of attorney's fees and expenses to WME.

## III. Appellate Attorney's Fees

[41] WME contends that it is also entitled to an award of appellate attorney's fees under Section 14.03(c) of the Operating Agreement. We agree. "[W]hen a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded." *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995, 1010 (Ind. Ct. App. 2015). Zollinger's only response to WME's request for fees is that the restrictions in the Operating Agreement are not enforceable and that, even if they are, he did not violate them. Because we have rejected those arguments, WME is entitled to an award of reasonable appellate attorney's fees, and we remand to the trial court for a determination of the appropriate award.

[42] Affirmed and remanded.

Altice, J., and Tavitas, J., concur.